**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-1663 & 14-2742
_____

JEFFREY E. PERELMAN, AS A PARTICIPANT IN
THE GENERAL REFRACTORIES COMPANY PENSION
PLAN FOR SALARIED EMPLOYEES

v.

RAYMOND G. PERELMAN; RONALD O. PERELMAN;
JASON GUZEK; GENERAL REFRACTORIES
COMPANY; RELIANCE TRUST COMPANY

Jeffrey E. Perelman, as a participant in the General
Refractories Company Pension Plan for Salaried Employees,
a/k/a the Grefco Minerals, Inc. Pension Plan for Salaried
Employees (the Pension Plan),

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-10-cv-05622)
District Judge: Honorable John R. Padova
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on April 17, 2015
_____

Before: AMBRO, VANASKIE, and SHWARTZ, *Circuit
Judges*

(Filed: July 13, 2015)

Paul A. Friedman, Esq.
Epstein, Becker & Green
250 Park Avenue
New York, NY 10177

Jonathan S. Goldman, Esq.
James T. Smith, Esq.
Rebecca D. Ward, Esq.
Blank Rome
130 North 18th Street
One Logan Square
Philadelphia, PA 19103
        *Counsel for Appellant*

Ethan M. Dennis, Esq.
Clark Hill
2005 Market Street
One Commerce Square, Suite 1000
Philadelphia, PA 19103

Clifford E. Haines, Esq.
Haines & Associates
1835 Market Street, Suite 2420
Philadelphia, PA 19103

Marjorie M. Obod, Esq.
Dilworth Paxson
1500 Market Street
Suite 3500E
Philadelphia, PA 19102
    *Counsel for Appellee Raymond G. Perelman*

Michael S. Doluisio, Esq.
William T. McEnroe, Esq.
Ryan M. Moore, Esq.
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Andrew J. Levander, Esq.
Dechert
1095 Avenue of the Americas
New York, NY 10036
    *Counsel for Appellee Ronald O. Perelman*

Derek J. Cusack, Esq.
Dicalite Management Group, Inc.
1 Bala Avenue
Suite 310
Bala Cynwyd, PA 19004
    *Counsel for Appellee General Refractories Company*

_____

OPINION

_____

3

VANASKIE, *Circuit Judge*.

This matter arises under § 502(a)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(3), which authorizes suits by, inter alia, a pension plan beneficiary to enjoin any act or practice that violates ERISA, "to obtain other appropriate equitable relief . . . to redress such violations," or to enforce any provision of ERISA or the terms of a pension plan. *Id.* Appellant Jeffrey Perelman is a participant in the defined employee pension benefit plan (the Plan) of Appellee General Refractories Company (GRC). Jeffrey alleges that his father, Raymond Perelman, as trustee of the Plan, breached his fiduciary duties by covertly investing Plan assets in the corporate bonds of struggling companies owned and controlled by Jeffrey's brother, Appellee Ronald Perelman. Jeffrey contends that these transactions were not properly reported; depleted Plan assets; and increased the risk of default, such that his own defined benefits are in jeopardy. The District Court dismissed several of Jeffrey's claims for lack of constitutional standing, later granted summary judgment against him on all remaining claims, and denied his application for attorneys' fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1). We will affirm.

I.

In 1982, Raymond became the Chairman of GRC, a large manufacturer of industrial materials.[1] Between 2003

───────────────

[1] Our recitation of the factual background of this appeal is derived primarily from the Second Amended Complaint.

4

and 2009, Raymond was a trustee of the GRC Plan, and he served as Plan Administrator between 2003 and 2005. In that position he exercised discretionary control over management of Plan assets and thus qualified as both a plan fiduciary and a "party in interest" under ERISA. *See* 29 U.S.C. § 1002(21)(A), (14)(A). Jason Guzek, a defendant in this action but not an appellee, assumed the role of Plan Administrator from 2006 to 2008 and was succeeded by GRC itself as Plan Administrator in 2009.

Raymond's son Ronald has been the controlling shareholder of Revlon, Inc., and its wholly owned subsidiary, Revlon Consumer Products Corporation (together, Revlon). Beginning in 2002, Raymond directed the Plan's purchase of roughly $2 million of high-risk Revlon corporate bonds. In 2004, Raymond converted those bonds into Revlon stock. He and his wife Ruth then assigned beneficial ownership of the Revlon shares to Mafco Holdings, Inc., another company owned and controlled by Ronald. As Plan trustee, Raymond also invested Plan assets in a lending agreement between Revlon and MacAndrews & Forbes Holdings, Inc. (MacAndrews), an entity that, like Revlon, was principally owned by Ronald. One consequence of these transactions was that Ronald, by virtue of his control over the voting rights of stock held by the Plan, became a Plan fiduciary under § 1002(21)(A). Ronald also qualified as a "party in interest," both because of that fiduciary status and as a relative of Raymond. *Id.* § 1002(14)(A), (F).

Since 1985, Jeffrey has been a participant in GRC's defined benefit pension plan. Jeffrey alleges that Raymond and Ronald, at the Plan's expense, structured transactions to allow Ronald to raise capital for Revlon without sacrificing his control over the company. Jeffrey contends that these

5

investments, which diminished Plan assets, were routinely misreported by the defendants on the annual reports that a plan administrator must file with the Internal Revenue Service (IRS) and Department of Labor. *See id.* §§ 1023–24. Between 2003 and 2005, the reports did not disclose that the Plan held investments in Revlon bonds. Instead, the 2003 and 2004 reports stated that all Plan assets were invested in master trust accounts, while the reports from 2005 through 2009 stated that all Plan assets were invested in mutual funds. Assessments from independent auditors, which were appended to the annual reports between 2003 and 2008, did disclose the investments in Revlon bonds, but either failed to identify those investments as party-in-interest transactions or did so for the wrong reasons. The Plan's investment in the lending agreement between Revlon and MacAndrews also was described inaccurately.

In October 2010, Jeffrey brought this lawsuit both as an individual and on behalf of the Plan against Raymond, Ronald, Guzek, and GRC. The Second Amended Complaint, filed on July 21, 2011, asserts the following: breach of fiduciary duty of care under 29 U.S.C. § 1104(a)(1)(B) against Raymond and Ronald (counts One and Ten, respectively); prohibited party-in-interest transactions under § 1106 against Raymond and Ronald (counts Two and Nine); failure to diversify plan assets under § 1104(a)(1)(C) against Raymond, Guzek, and GRC (counts Three and Six); failure to update or maintain proper plan documents under §§ 1024–27 against Raymond, Guzek, and GRC (counts Four and Seven); improper delegation of control of plan assets under § 1104(a)(1) against Raymond (count Five); and failure to prosecute a co-fiduciary's breach of fiduciary duty against Guzek, GRC, and Ronald (counts Eight and Eleven). The

6

Complaint seeks monetary relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), in the form of restitution for Plan losses and disgorgement of profits. It also demands injunctive relief, including removal of Raymond as trustee; appointment of an independent trustee; an outside audit for all Plan years from 2002 to 2010; an order enjoining Raymond from ever again serving in a fiduciary capacity for an ERISA plan; and an order declaring void any provision in the Plan or its Trust Agreement that would indemnify any defendant. Finally, the Complaint requests attorneys' fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

In August 2012, the District Court found that Jeffrey lacked constitutional standing to pursue restitution and disgorgement claims because he had failed to demonstrate an actual injury to himself, as opposed to the Plan. The Court nonetheless permitted Jeffrey to pursue the other requested forms of injunctive relief. Thereafter, in September 2012, Raymond executed a corporate resolution terminating himself as trustee and appointing Reliance Trust Company to that position.[2] GRC also retained the services of an independent investment manager for the Plan. And earlier in 2012, Raymond voluntarily contributed $270,446.42 to the Plan's trust. None of these actions, however, included an admission of culpability or wrongdoing.

---

[2] The District Court later granted Jeffrey's motion to add Reliance Trust Company as a defendant, but Jeffrey eventually stipulated to the dismissal of both Reliance and Guzek, neither of whom are parties to this appeal.

In January 2013, the Court denied Jeffrey's motion to file a Third Amended Complaint, finding that the addition of a claim for monetary damages under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), would be futile, again for failure to allege an actual injury. The Court also denied as moot Jeffrey's bid to remove Raymond as trustee. With respect to the trustee indemnification language, the Court concluded that the Plan's clause fell within a safe-harbor provision because any indemnification would be funded by GRC rather than by the Plan itself. Because the Trust Agreement, however, was ambiguous as to which entity would fund any indemnification, the Court concluded that Jeffrey had stated a claim for relief as to that document. The Court dismissed Jeffrey's claim to permanently bar Raymond from serving as an ERISA fiduciary, finding that the Secretary of Labor, rather than Jeffrey, was the appropriate party to seek such relief with respect to pension plans in which Jeffrey was not a participant or beneficiary. And finally, the Court concluded that Jeffrey's request for a historical audit would serve only to support an attendant claim for restitution and disgorgement, which the Court had already concluded was impermissible in the absence of actual injury sustained by Jeffrey. The Court thus limited the scope of Jeffrey's demand for an audit to a determination of whether the Plan was currently at risk of default.

In February 2014, the Court granted summary judgment in favor of the defendants on all remaining claims. First, the Court concluded that, under statutorily endorsed accounting principles, no genuine dispute of material fact existed as to whether the Plan was currently funded, meaning that Jeffrey was not entitled to audit relief. The Court also

concluded that no live case or controversy existed with respect to the Trust Agreement's indemnification clause.

On April 14, 2014, the District Court denied Jeffrey's application for attorneys' fees and costs, finding that Jeffrey had not achieved "some degree of success on the merits," *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983), and that even if some degree of success had been achieved, Jeffrey had not demonstrated an entitlement to fees under the five-factor test announced in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983). He filed a timely appeal.

II.

The District Court had jurisdiction under 29 U.S.C. § 1132(e) and (f). We have appellate jurisdiction under 28 U.S.C. § 1291.

Jeffrey raises two main claims on appeal. First, he contends that he has standing to seek monetary equitable relief such as disgorgement or restitution under ERISA § 502(a)(3) because (1) he did in fact suffer an increased risk of Plan default with respect to his defined benefits, and (2) insofar as he seeks relief on behalf of the Plan, no showing of individual harm is necessary. Second, Jeffrey challenges the denial of attorneys' fees and costs, contending that (1) his lawsuit was a catalyst for the voluntary resolution of several issues, including Raymond's resignation as Trustee, and (2) the District Court misapplied the five *Ursic* factors.

A.

The burden of establishing standing lies with the plaintiff. *Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009).

We exercise de novo review over a district court's legal conclusions related to standing and review the factual elements underlying that determination for clear error. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013).

The three well-established elements of the doctrine of constitutional standing are as follows:

> First, the plaintiff must suffer an injury-in-fact that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical. [*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).] Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quotation marks omitted).

*Id.* at 415.

Over the past fifteen years we have twice grappled with the complexities of constitutional standing as it relates to claims for monetary equitable relief brought by plan participants under ERISA § 502(a)(3). *See id.* at 414–19; *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455–57 (3d Cir. 2003).[3] Jeffrey's standing here, like that of the plaintiffs in *Edmonson* and *Horvath*, turns primarily on the first element—"injury-in-fact," also described as "actual harm." *See Horvath*, 333 F.3d at 456. With respect to claims for injunctive relief, such injury may exist simply by virtue of the defendant's violation of an ERISA statutory duty, such as failure to comply with disclosure requirements. *See id.* Claims demanding a monetary equitable remedy, by contrast, require the plaintiff to allege an individualized financial harm traceable to the defendant's alleged ERISA violations. *Id.* at 457.[4]

---

[3] The parties do not dispute that Jeffrey, as a Plan participant and beneficiary, has statutory standing to bring a claim under ERISA § 502(a)(3).

[4] As we discuss below, our later opinion in *Edmonson* clarified that where a plaintiff seeks disgorgement, rather than "make-whole" relief such as restitution or surcharge, the financial harm need not necessarily take the form of a "loss"—it may instead consist of the measure of the defendant's unjust profits coupled with the right of the beneficiary, as opposed to the plan, to those profits. 725 F.3d at 418.

Jeffrey claims two financial injuries that, in his view, support a finding of standing to pursue "make-whole" equitable relief in the form of restitution or surcharge. First, he submits expert testimony that the Plan suffered a net diminution in assets of approximately $1.3 million as a result of Raymond's investment of Plan assets in Revlon debt.[5] Second, he offers expert testimony that due to this diminution in assets, the Plan's risk of default increased dramatically. He concedes, however, that to date, he has received all distributions under the Plan to which he was entitled.

In the case of a defined benefit plan, like the Plan here, the Supreme Court has established that diminution in plan assets, without more, is insufficient to establish actual injury to any particular participant. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439–41 (1999). This stems from the fact that participants in such a plan are entitled only to a fixed periodic payment, and have no "claim to any particular asset that composes a part of the plan's general asset pool." *Id.* at 440. Accordingly, even if the defendants' dealings resulted in a diminution in Plan assets, they are insufficient to confer standing upon Jeffrey absent a showing of individualized harm.

By contrast, there is some support for the notion that a participant or beneficiary in a defined benefit plan has suffered an injury sufficient to pursue a claim for "make-whole" equitable monetary relief under § 502(a) where the fiduciary's alleged misconduct "creates or enhances the risk

---

[5] This sum accounts for Raymond's voluntary payment of $270,446 into the Plan's trust in 2012.

of default by the entire plan." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008). The risk of default by defined benefit plans, of course, is not a novel or abstract concept. Congress has sought rigorously to minimize or eliminate such risk by requiring defined benefit plans "to satisfy complex minimum funding requirements, and to make premium payments to the Pension Benefit Guaranty Corporation for plan termination insurance." *Id.*

Specifically, an employer must make "minimum required contribution[s]" to its defined benefit plan whenever "the value of plan assets" is less than the plan's yearly "funding target," defined as "the present value of all benefits accrued or earned under the plan as of the beginning of the plan year." 26 U.S.C. § 430(a)(1), (d)(1); 29 U.S.C. § 1083(a)(1), (d)(1). In other words, an employer is required to contribute to a plan whenever the plan's liabilities exceed its assets. However, a plan does not qualify as "at-risk" or "underfunded"—statuses which trigger even more onerous funding safeguards—unless the value of plan assets is less than 80% of the plan's funding target. 26 U.S.C. § 430(i)(4), (f)(3)(C); 29 U.S.C. § 1083(i)(4), (f)(3)(C).

Under the same statutory scheme, plan surpluses or shortfalls are calculated based on prevailing "segment rates," i.e., interest rates based on historical bond yields. *See* 26 U.S.C. § 430(h)(2); 29 U.S.C. § 1083(h)(2). On July 6, 2012, Congress enacted the Moving Ahead for Progress in the 21st Century Act (MAP-21), Pub. L. No. 112-141, § 40211, 126 Stat. 405, 846–50 (2012), which authorized the use of new segment rates beginning December 31, 2011. *See* 26 U.S.C. § 430(h)(2)(C)(iv); 29 U.S.C. § 1083(h)(2)(C)(iv). That authorization was extended in August 2014 and remains operative. *See* Highway and Transportation Funding Act of

2014 (HAFTA), Pub. L. No. 113–159, § 2003, 128 Stat. 1839, 1849–51 (2014).  As explained in HAFTA's legislative history, "MAP–21 modified the interest rates used in valuing pension liabilities to give employers the option to effectively spread out the higher contributions over a longer period of time than would otherwise have been required."  H.R. Rep. No. 113-520, pt. 1, at 19 (2014).

As of January 1, 2013, the date of the Plan's most recent available actuarial report, the Plan had assets of approximately $13.6 million.  Jeffrey concedes that, under MAP-21 accounting methods, the Plan's liabilities at that time were approximately $13.0 million, meaning that the Plan's assets exceeded its liabilities.  By the same token, however, we accept his allegations (which are bolstered by his expert) that, under the statutory valuation methods predating MAP-21, the Plan's liabilities on an ongoing plan basis were approximately $16 million—a ratio that left the Plan only 85% funded.  In Jeffrey's view, the fact that the Plan's assets were less than its liabilities under at least one analytical approach would permit a factual finding that Raymond's dealings increased the risk that the Plan might default on its obligations.  Jeffrey argues that the dueling legitimacy of the two accounting approaches is a question of fact that must be resolved at trial.

We agree with the District Court, however, that the controlling yardstick here is provided by the finely tuned framework established by Congress.  Where a plan's assets exceed its liabilities under a statutorily accepted accounting method, it passes muster as a matter of law, i.e., the employer need not make additional contributions to remove a designation of "at-risk" or "underfunded" status.  *See, e.g.*, *Harley v. Minn. Min. & Mfg. Co.*, 284 F.3d 901, 908 (8th Cir.

14

2002) (finding no injury where plan funding level had not triggered minimum required contributions); *Adedipe v. U.S. Bank, Nat'l Ass'n*, 62 F. Supp. 3d 879, 894–95 (D. Minn. 2014) (concluding that the "relevant measure" for actual injury is whether the plan's funding levels triggered minimum required contributions).

Here, the evidence is undisputed that as of January 1, 2013, under a valuation method approved by Congress, the Plan was appropriately funded, and GRC had no obligation to make further contributions to stabilize the Plan's finances. Under the circumstances, Jeffrey's allegation that the Plan is nonetheless at risk of default is entirely speculative. *See David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013) ("[T]he risk that Appellants' pension benefits will at some point in the future be adversely affected as a result of the present alleged ERISA violations is too speculative to give rise to Article III standing."); *Harley*, 284 F.3d at 906–07 (noting that because of minimum contribution requirements, diminutions in plan surplus generally do not result in actual harm to beneficiaries). Thus, like the District Court, we conclude that the SAC fails to allege the actual harm required to sustain constitutional standing for an individual claim of "make-whole" equitable relief under § 502(a)(3).

Jeffrey also claims that he has standing to seek disgorgement of profits under *Edmonson*, where we recognized that "an ERISA beneficiary suffers an injury-in-fact sufficient to bring a disgorgement claim when a defendant allegedly breaches its fiduciary duty, profits from the breach, and the beneficiary, as opposed to the plan, has an individual right to the profit." 725 F.3d at 418. He is correct that, to pursue such a claim, a plaintiff need not plead a financial loss. Nonetheless, the plaintiff must still show "an

15

individual right to the defendant's profit . . . ." *Id.* at 417. Jeffrey has failed to do so.

Finally, Jeffrey argues that he need not prove an individualized injury insofar as he seeks monetary equitable remedies in a "derivative" or "representative" capacity on behalf of the Plan.[6] Our own case law provides no support for this theory, and other federal appellate courts have unanimously rejected it. *See Alphin*, 704 F.3d at 334–36 (finding no representational standing where plaintiffs suffered no individualized injuries); *McCullough v. AEGON USA Inc.*, 585 F.3d 1082, 1086 (8th Cir. 2009) (same); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608–09 (6th Cir. 2007) (same); *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (noting that there is "no . . . tradition of unharmed ERISA beneficiaries bringing suit on behalf of their plans"); *Harley*, 284 F.3d at 906 ("[T]he limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered no injury in fact from

---

[6] There is no question that representative suits by plan participants or beneficiaries against fiduciaries for breach of fiduciary duty are permitted by, and generally brought under, ERISA § 502(a)(2). *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985). A handful of courts have concluded that § 502(a)(3) also authorizes representative suits seeking equitable recovery on behalf of a plan. *See, e.g.*, *Banyai v. Mazur*, No. 00-civ-9806(SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007). We will not reach that question because we conclude that Jeffrey lacks standing in any event.

16

suing to enforce ERISA fiduciary duties on behalf of the Plan.") (emphasis omitted). Jeffrey provides no authority or other convincing reason for us to break from the reasoned consensus of our sister circuits.[7] Accordingly, we conclude that Jeffrey lacks standing to sue under § 502(a)(3) even in a purely representative capacity insofar as he seeks monetary equitable relief. In sum, we will affirm the District Court's dismissal of all counts in the Second Amended Complaint insofar as Jeffrey seeks monetary equitable relief.[8]

---

[7] Jeffrey suggests that if plan participants and beneficiaries lack standing to bring representative claims for monetary equitable relief, misconduct by plan fiduciaries will go unpunished. The Secretary of Labor, however, has standing to seek appropriate relief for fiduciary misconduct under § 502(a)(2).

[8] As noted earlier, Jeffrey also appeals from the District Court's denial of his motion to file a Third Amended Complaint, which differed from his preceding drafts principally in that it sought monetary relief under ERISA § 502(a)(2). That provision allows plan beneficiaries to bring a derivative suit seeking relief from plan fiduciaries for breach of fiduciary duty under ERISA § 509, 29 U.S.C. § 1109. *See, e.g.*, *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 594–95 (3d Cir. 2009). We agree with the District Court that Jeffrey's failure to allege actual injury leaves him without standing to bring suit for monetary damages under § 502(a)(2), just as it bars his existing claims under § 502(a)(3). Accordingly, because Jeffrey's proposed amendment would be futile, we will affirm the District Court's denial of leave to amend.

B.

Jeffrey's remaining challenge is to the District Court's denial of attorneys' fees and costs. Our review of a district court's denial of an award of attorneys' fees is for abuse of discretion, but we review the applicable legal standards de novo. *McPherson v. Emps.' Pension Plan of Am. Re-Ins. Co.*, 33 F.3d 253, 256 (3d Cir. 1994).

ERISA § 502(g)(1) permits a district court to award "a reasonable attorney's fee and costs" even to a losing party, although only one who has achieved "'some degree of success on the merits.'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244–45 (2010) (quoting *Ruckelshaus*, 463 U.S. at 694). Surmounting that hurdle requires more than "'trivial success on the merits' or a 'purely procedural victory.'" *Id.* at 255 (quoting *Ruckelshaus*, 463 U.S. at 688 n.9) (alteration omitted). Instead, the court must be able to resolve the question "without conducting a 'lengthy inquir[y] into the question whether a particular party's success was

---

Jeffrey also purports to appeal from all of the District Court's many legal rulings contained within its orders of August 28, 2012, January 24, 2013, February 18, 2014, and April 14, 2014, including rulings addressing his claims for injunctive relief. Nonetheless, he makes no tailored argument that the District Court's dismissal or grant of summary judgment on those claims was inappropriate in any particular respect. We will therefore affirm the District Court's rejection of all remaining claims for equitable relief.

18

'substantial' or occurred on a 'central issue.'" *Id.* (alteration in original).

Here, Jeffrey relies on what we have called the "catalyst theory" to establish that he has achieved some degree of success on the merits. Under that theory, a plaintiff may satisfy the *Ruckelshaus* standard if, despite failing to obtain a judgment or even a single ruling in his favor, his "litigation activity pressured a defendant to settle or render to a plaintiff the requested relief." *Templin v. Independence Blue Cross*, 785 F.3d 861, 866 (3d Cir. 2015) (emphasis omitted).

The District Court determined that Jeffrey had not achieved a level of substantive success sufficient to support an award of fees under ERISA § 502(g)(1). We conclude otherwise. The record reflects that, after the filing of Jeffrey's lawsuit, Raymond stepped down as Plan trustee; an independent trustee was appointed; some Plan losses were reimbursed; Plan records were amended to reflect party-in-interest transactions; and trustee-indemnification provisions were modified or removed. Raymond's counsel conceded that these actions, which for the most part numbered among the demands for relief stated in the Complaint, "were done in an effort to get rid of this case." App. 902. The concessions were not merely procedural, and instead had a definite impact on Raymond's degree of control over Plan assets and on the likelihood of accurate reporting of transactions involving Plan assets in the future. Although such victories were non-monetary, that renders them no less substantive.

Even where the party has achieved success on the merits, however, the district court nonetheless retains

19

discretion as to whether to award fees in light of the familiar *Ursic* factors, which include:

> (1) the offending parties' culpability or bad faith;

> (2) the ability of the offending parties to satisfy an award of attorneys' fees;

> (3) the deterrent effect of an award of attorneys' fees against the offending parties;

> (4) the benefit conferred on members of the pension plan as a whole; and

> (5) the relative merits of the parties' position[s].

719 F.2d at 673. The District Court considered the *Ursic* factors in the alternative, and found that although the second and third factors—ability to pay and deterrent effect—weighed in Jeffrey's favor, the first, fourth, and fifth factors—culpability, benefit conferred on Plan members other than Jeffrey, and the relative merits of the parties' positions—weighed against an award of fees. On the whole, the Court found that an award of fees was not appropriate.

We conclude that the District Court did not abuse its discretion by declining to award fees. First, the culpability of the defendants remains speculative. Second, the benefit of Jeffrey's lawsuit to other Plan participants has been of a limited and non-monetary nature—the Plan itself remains

fully funded under federal benchmarks. And third, for the reasons already stated at great length both here and in the District Court, Jeffrey's legal efforts to date, which have involved several years of litigation and four iterations of the complaint, were predicated in large part upon a flawed theory of constitutional standing. Under the circumstances, we conclude that the District Court did not abuse its discretion in declining to compel the defendants to finance Jeffrey's lawsuit. Accordingly, we will affirm the District Court's denial of attorneys' fees and costs to Jeffrey under ERISA § 502(g)(1).

## III.

For the foregoing reasons, we will affirm the District Court's orders of August 28, 2012; January 24, 2013; February 18, 2014; and April 14, 2014.