ROTH, Senior Judge, concurring in part and dissenting in part:
 

 Like many large employers, the University of Pennsylvania maintains a retirement plan for its employees. Between 2009 and 2014, the plan's assets increased in value by $ 1.6 billion, a 73% return on investment. Despite this increase, plaintiffs have filed a putative class action, claiming that the plan's fiduciaries have imprudently managed it and seeking tens of millions of dollars of damages. Having convinced this Court to reverse in part the District Court's dismissal of the action, the plaintiffs will continue to pursue their remaining claims, which will be litigated extensively, at large cost to the university. As a result, the university is in an unenviable position, in which it has every incentive to settle quickly to avoid (1) expensive discovery and further motion practice, (2) potential individual liability for named fiduciaries,
 
 [1]
 
 and (3) the prospect of damages
 calculations, after lengthy litigation, with interest-inflated liability totals.
 

 This pressure to settle increases with the size of the plan, regardless of the merits of the case. Alleged mismanagement of a $ 400,000 plan will expose fiduciaries to less liability than mismanagement of a $ 4 billion plan. Thus, notwithstanding the strength of the claims, a plaintiff's attorney, seeking a large fee, will target a plan that holds abundant assets. I am concerned that this is the case both here and in numerous other lawsuits that have targeted large corporations and universities that administer some of the largest retirement plans in the country.
 
 [2]
 

 This strategy has substantial consequences for fiduciaries of these plans, particularly at universities. While the fiduciaries for large corporations may have experience in dealing with potential liabilities, fiduciaries at universities are often staff members who volunteer to serve in these roles.
 
 [3]
 
 Even though indemnification agreements exist for these individual members, as long as they are party to the suit they will be required to disclose this litigation in personal financial transactions.
 
 [4]
 
 Moreover, universities, which unlike large corporations are not typically in the business of profitmaking, must keep in mind, when determining how best to proceed in litigation, that the university will be responsible for any damages award. This reality demands that cases such as this one be carefully scrutinized in order not to permit implausible allegations to result in a large settlement, under which a substantial portion of the funds that are to be reimbursed to retirement plans are instead diverted to attorneys' fees.
 

 Ultimately, this case presents a question virtually identical to the one addressed by this Court seven years ago, in
 
 Renfro v. Unisys Corp.
 

 [5]
 
 : Does an ERISA plan fiduciary acting in good faith, under the prudent person standard, have a duty to do more than provide a wide, reasonable, and low-cost variety of investment options for individual plan beneficiaries who want to have control over their own investment portfolio? Plaintiffs contend that because the pleadings have identified specific problematic funds in the mix and range offered by defendants, the answer should be yes. The majority agrees, holding that the administrators of a pension plan must ensure that sophisticated investors receive the best version of each plan available. This departs from the core principles in
 
 Renfro
 
 , set out above, which the District Court followed faithfully. For these reasons, I would affirm in full the District
 Court's dismissal of the amended complaint.
 

 I
 

 The Plan, as explained by the District Court, is a defined-contribution plan that offers its beneficiaries four levels of involvement in their investments. The first tier is a "do-it-for-me" tier, where investors have their choice between a TIAA target fund and a Vanguard target fund, which funds automatically adjust their investment strategy with no input from the beneficiary, based on an expected retirement date. Tier 2 is a "help-me-do-it" tier, which allows a beneficiary to select from a group of eight options and weigh them as preferred. The third tier is a "mix-my-own" tier, which provides a few options for each of nine types of funds. And finally, Tier 4 is a "self-directed" tier, which provides access to the full panoply of 78 funds offered by defendants.
 
 [6]
 

 Of these 78 investment options, virtually all are mutual funds. Over the course of the class period, the proportion of retail-class mutual funds, as opposed to cheaper institutional-class mutual funds, has varied. Appellants have specifically challenged 58 of these retail-class funds as having had cheaper but otherwise identical institutional-class analogues at some point during the class period (Count V). Defendants note in this connection that dozens of funds have been switched to institutional classes over time. Plaintiffs also challenge the method in which fees are calculated (Count III), stating that an asset-based calculation has overcompensated the record keepers and that a failure to negotiate rebates constituted a breach of fiduciary duty.
 

 At argument, when asked about the four separate tiers of beneficiary involvement, plaintiffs stated that the funds being challenged were largely related to Tiers 3 and 4, and in a follow-up response, specifically excluded Tier 1 from the scope of the complaint.
 

 II
 

 It is well established that ERISA was intended to be a "comprehensive and reticulated" statute
 
 [7]
 
 enacted after "a decade of congressional study of the Nation's private employee benefit system."
 
 [8]
 
 ERISA "resolved innumerable disputes between powerful competing interests-a balance between encouraging the creation of plans and ensuring enforcement of rights under a plan."
 
 [9]
 
 Congress intended to create a system "that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place."
 
 [10]
 
 Instead, ERISA's purpose is, in part, to "assur[e] a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders
 and awards when a violation has occurred."
 
 [11]
 

 Plaintiffs' counsel, "one of the few firms handling ERISA class actions such as this,"
 
 [12]
 
 have brought numerous ERISA suits across the country. While these cases were at first limited to corporate retirement plans,
 
 [13]
 
 they have expanded to include several suits against university retirement plans.
 
 [14]
 
 These cases typically are not litigated to conclusion, either terminating through settlement or a judicial finding against the plaintiffs.
 

 Given that these cases are brought as putative class actions, counsel is able to petition the court for fees after a successful settlement. In cases of successful settlements, counsel, upon petition, are often awarded one third of the settlement amount, plus expenses, from the settlement fund.
 
 [15]
 
 While benefits to the plan may result from the settlement, they are substantially diluted by the fees' calculation, even before considering the litigation costs that the universities shoulder through the motion to dismiss stage. Indeed, while there is no comprehensive listing of "jumbo plans" maintained in this country, this pattern of bringing class actions against large funds seems to have sustained itself and could continue as long as more plans can be identified.
 

 Such a result would be the opposite of "assuring a predictable set of liabilities, under uniform standards of primary conduct."
 
 [16]
 
 Indeed, it would not only discourage the offering of these plans, but it would also discourage "individuals from serving as fiduciaries."
 
 [17]
 
 Therefore, in enforcing the pleading standards under
 
 Twombly
 
 and
 
 Iqbal
 
 , courts must take great care to allow only plausible, rather than possible, claims to withstand a motion to dismiss.
 
 [18]
 
 While the majority takes
 great care to lay out the pleading standards that govern this dispute, for the reasons stated below, I disagree that those standards have been met.
 

 The majority cites
 
 Fifth Third Bancorp v. Dudenhoeffer
 

 [19]
 
 to support discarding any concern of encouraging attorney-driven litigation, despite its "appreciation of Penn and amici's fear of frivolous litigation."
 
 [20]
 
 But
 
 Fifth Third
 
 concerned an employee stock ownership plan, under which employees invested primarily in the stock of their employer, a plan that the majority points out is subject to distinct duties under
 
 29 U.S.C. § 1104
 
 (a).
 
 [21]
 
 The defendants in that case were arguing for a special presumption that investments in the employer's stock would be prudent unless the employer was in dire financial straits.
 
 [22]
 
 No such presumption is necessary here to determine under
 
 Renfro
 
 that plaintiffs' claims were properly dismissed.
 

 For the above reasons, I conclude that the District Court's analysis of this case, following
 
 Renfro
 
 , was the correct one.
 

 III
 

 Turning then to a more pragmatic concern with the pleading here, ERISA states that a civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary."
 
 [23]
 
 This statutory edict, however, does not override the constitutional requirements for standing.
 
 [24]
 
 In order for a plaintiff to carry her burden of establishing constitutional standing,
 
 [25]
 
 three elements must be met: (1) an injury in fact "that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical", (2) a causal connection between that injury and the conduct so that the injury is fairly traceable to the defendant's action, and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."
 
 [26]
 
 We have held that "an ERISA beneficiary suffers an injury-in-fact ... when a defendant allegedly breaches its fiduciary duty, profits from the breach, and the beneficiary, as opposed to the plan, has an
 
 individual
 
 right to the profit."
 
 [27]
 

 Plaintiffs allege that the Plan's use of the 58 retail-class funds that had cheaper institutional-class analogues caused an injury in fact sufficient to confer standing for Count V. They do not, however, automatically have an individual right to the alleged lost profits simply because they are participants in the Plan broadly. At argument, plaintiffs specifically conceded that Tier 1 did not include any of the 58 funds challenged in Count V; plaintiffs limited
 their focus in Count V to Tiers 3 and 4. Therefore, in order for plaintiffs to carry the burden of proof that they were injured by the selection of the 58 retail-class funds, they must plead that they were participants in Tier 3 or Tier 4. They have not done so here.
 

 The amended complaint does not contain facts that link any of the named plaintiffs to any tier at any point during the class period. While a paragraph in the complaint is devoted to each of the six plaintiffs, each of those paragraphs consists of three sentences. The first lists the plaintiff's name and residence, the second states the plaintiff's job title, and the third sentence is as follows, with changes only for gender: "She is a participant in the Plan under
 
 29 U.S.C. § 1002
 
 (7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan."
 
 [28]
 
 This averment indicates merely that plaintiffs are participants under the definition of § 1132(a)(2). It provides no information as to which tier, or tiers, any individual plaintiff chose for investment. Indeed, the entire record contains no direct information on this point. Plaintiffs conceded this at oral argument. The "standing" portion of the amended complaint does imply that plaintiffs invested in ways consistent with being in a more active investment tier, but it does so by alleging generally that "the named Plaintiffs and all participants in the Plan suffered financial harm" as a result of defendants conduct alleged in Count V.
 
 [29]
 
 This cannot be sufficient.
 
 [30]
 

 This language in the amended complaint appears to mirror its citation to
 
 LaRue v. DeWolff, Boberg & Assocs.
 
 to support standing here.
 
 [31]
 
 However,
 
 LaRue
 
 does not save plaintiffs. The two situations in
 
 LaRue
 
 that the Supreme Court held to constitute cognizable claims under § 1132(a)(2) were instances when "a fiduciary breach diminishes plan assets payable to
 
 all participants and beneficiaries
 
 , or ... to persons tied to particular individual accounts."
 
 [32]
 
 The latter justification is identical to our test above, and as counsel conceded at argument, the plan's system of tiers included at least one tier, Tier 1, that was not alleged to have been affected by retail-class investments, rendering the former justification inapplicable. As a result, I would affirm the District Court's dismissal of Count V.
 
 [33]
 

 If this were the only deficiency in plaintiffs' amended complaint, the appropriate remedy would be to dismiss Count V without prejudice to allow plaintiffs an opportunity to allege sufficient facts regarding the tiers they invested in. However, for the reasons below, I believe that dismissing Count V without prejudice would be futile because plaintiffs have otherwise failed to
 plead a claim upon which relief can be granted.
 
 [34]
 

 IV
 

 In
 
 Renfro v. Unisys Corp.
 
 , we evaluated a similar complaint at the same stage in litigation, and determined that the mix and range of investment options in the retirement plan provided by Unisys was sufficient to demonstrate that the defendants' fiduciary duty had been met.
 
 [35]
 
 Despite a greater mix and range of options in the instant case, the majority believes that the standards that foreclosed the plaintiffs' arguments in
 
 Renfro
 
 do not do so here. However, a close look at the facts indicates that plaintiffs' arguments under both Counts III and V are the same as, if not in fact weaker than, in
 
 Renfro
 
 .
 

 I will turn to Count V first. Three fact patterns were presented in
 
 Renfro
 
 : the facts surrounding the Unisys plan as well as facts from two cases we considered from other circuits with opposite outcomes. In
 
 Braden v. Wal-Mart Stores, Inc.
 
 , the Eighth Circuit reversed the district court's grant of a motion to dismiss, as the plan at issue contained only thirteen investment options and was alleged to be part of a kickback scheme.
 
 [36]
 
 In contrast, in
 
 Hecker v. Deere & Co.
 
 , the Seventh Circuit affirmed the dismissal of a complaint against a plan with twenty-three mutual fund options and a third-party service that provided beneficiaries access to hundreds more.
 
 [37]
 
 The Seventh Circuit reasoned that it was implausible that this structure did not grant beneficiaries sufficient investment choices, as the fees on each of these options ranged from 0.07% to 1% across all funds.
 
 [38]
 

 In
 
 Renfro
 
 , the Unisys plan included 73 distinct investment options,
 
 [39]
 
 71 of which were specifically named in the operative complaint as having excessive fees. Fees among the investment options in the Unisys plan ranged from 0.1% to 1.21%. We held that since the allegations solely contested the fees charged in the Unisys plan, we could not "infer from what is alleged that the process was flawed,"
 
 [40]
 
 and we affirmed the dismissal of the excessive investment fees claim.
 
 [41]
 

 In the instant case, the Plan has had a minimum of 78 investment options during the class period, 58 of which are specifically contested in the amended complaint. Fees among these options in the Plan range from 0.04% to 0.87%. Despite plaintiffs' claims that these fees are excessive, their attempts to distinguish
 
 Renfro
 
 boil down to the level of detail in the complaint rather than, for example, any change in market circumstances that might render this 0.04% to 0.87% range excessively high today. While the question of fiduciary breach does not boil down to a numerical calculation, plaintiffs do not contest that the Plan has a greater number of investment
 options than the Unisys plan and that the highest and lowest fees charged by Plan funds are both lower than in
 
 Renfro
 
 . It is therefore difficult to see, in the absence of additional allegations regarding market circumstances or fiduciary misconduct, how this claim could be plausible if the claims in
 
 Renfro
 
 were not.
 

 The majority believes that endorsing this reasoning would allow a fiduciary to "avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming."
 
 [42]
 
 This oversimplifies the analysis in
 
 Renfro
 
 , which afforded substantial weight in its discussion of
 
 Braden
 
 to allegations of a kickback scheme.
 
 [43]
 
 If coupled with other allegations of mismanagement, a plan flooded with hundreds of options might itself be evidence of an imprudently clumsy attempt at fiduciary compliance or a distraction from bad-faith dealings.
 

 In the instant case, plaintiffs do not allege any such schemes. Even their prohibited transaction claims, which the majority properly dismissed, derive from an "extremely broad" reading of
 
 29 U.S.C. § 1106
 
 rather than any self-interest on the part of the fiduciaries. Without more, the Count V challenge to the Plan is neatly circumscribed by
 
 Renfro
 
 , regardless of the level of specificity devoted to the pleadings.
 
 [44]
 

 Moreover, plaintiffs' admission that the challenged funds are primarily offered to Tiers 3 and 4 compels this outcome. If the challenged funds were being provided in Tier 1-that is, to investors who wished to have their investments managed for them-the selection of more expensive share classes in a large portion of the fund would be concerning. However, since Tiers 3 and 4 attract investors who have a more sophisticated understanding of investment options and, inversely, are unlikely to attract investors who might be easily confused by the available investments, the overall mix and range of options is not disturbed by the fact that only the retail-class option was available for a proportion of the funds in these tiers. The majority stresses the importance of "Penn's 'conduct in arriving at an investment decision' "
 
 [45]
 
 but fails to mention that twenty funds were switched from retail-class shares to institutional-class shares between 2011 and 2016, a shift that demonstrates that defendants, in choosing investment options, were not deliberately ignoring the benefits of institutional-class shares.
 

 The majority alternatively suggests that this analysis is too singularly focused on numerical performance or on allegations of misconduct. But both cannot be true simultaneously. A plausible allegation of either kind at the pleading stage would be sufficient to defeat a motion to dismiss, but plaintiffs here have not plausibly alleged either. I would therefore affirm the District Court's dismissal of Count V.
 

 V
 

 The plain text of
 
 Renfro
 
 also mandates that plaintiffs' Count III claim regarding the method of calculating fees must fail. In rejecting a similar, albeit less thoroughly pled, excessive fees claim, we stated that the
 
 Renfro
 
 plaintiffs' "allegations concerning
 fees are directed exclusively to the fee structure and are limited to contentions that Unisys should have paid per-participant fees rather than fees based on a percentage of assets in the plan."
 
 [46]
 
 This is an exact description of Count III, and the parallel logic is apparent between the two complaints, even if the amended complaint here is supplemented with more concrete numbers than the
 
 Renfro
 
 complaint. The allegations that failed in
 
 Renfro
 
 must fail here also.
 

 The majority relies solely on
 
 Tussey v. ABB, Inc.
 

 [47]
 
 to demonstrate that claims involving excessive recordkeeping fees can survive a motion to dismiss. This reliance is improper. The Eighth Circuit noted that "unlike" cases like
 
 Renfro
 
 ,
 
 Tussey
 
 "involve[d] significant allegations of wrongdoing, including allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense."
 
 [48]
 
 Plaintiffs had proven, during a bench trial, that ABB had been explicitly warned about the excessiveness of their revenue sharing agreement and had failed to act in any way upon that warning.
 
 [49]
 
 No such facts are alleged here, and as such, plaintiffs' Count III claim must fail.
 
 [50]
 

 VI
 

 For these reasons, I would affirm the District Court's dismissal of all counts of the amended complaint. I therefore respectfully dissent from the majority's decision to reverse the District Court's dismissal of Counts III and V of the amended complaint.
 

 Sec'y, U.S. Dep't of Labor v. Kwasny
 
 ,
 
 853 F.3d 87
 
 , 91-92 (3d Cir. 2017).
 

 For a representative sample of cases plaintiffs' counsel has brought against corporations and universities respectively, see
 
 infra
 
 notes 26-27.
 

 While this suit does not name the members of the Investment Committee as defendants, and the record does not specify the members of the Investment Committee or their roles within the university, other suits name staff members as individual defendants.
 
 E.g.
 
 ,
 
 Tracey v. Mass. Inst. Of Tech.
 
 , No. 16-11620,
 
 2017 WL 4453541
 
 (Aug. 31, 2017),
 
 adopted in part and rejected in part
 
 ,
 
 2017 WL 4478239
 
 (Oct. 4, 2017).
 

 See
 

 Cunningham v. Cornell Univ.
 
 , No. 16-cv-6525,
 
 2018 WL 1088019
 
 , at *1 (Jan. 19, 2018) ("Plaintiffs shall address why they need to name 29 additional individuals as defendants other than (a) they think they can; and (b) the assertion of multi-million dollar claims against these individuals who served on a committee at their employer's request has the tremendous power to harass these individuals because they will be required to list the lawsuit on every auto, mortgage or student financial aid application they file.").
 

 671 F.3d 314
 
 , 327-28 (3d Cir. 2011).
 

 Before October 2012, forty additional funds were included in this tier, for a total of 118.
 

 Great-West Life & Annuity Ins. Co. v. Knudson
 
 ,
 
 534 U.S. 204
 
 , 209,
 
 122 S.Ct. 708
 
 ,
 
 151 L.Ed.2d 635
 
 (2002).
 

 Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.
 
 ,
 
 768 F.3d 284
 
 , 291 (3d Cir. 2014) (quoting
 
 Mertens v. Hewitt Assocs.
 
 ,
 
 508 U.S. 248
 
 , 251,
 
 113 S.Ct. 2063
 
 ,
 
 124 L.Ed.2d 161
 
 (1993) );
 
 accord
 

 Renfro v. Unisys Corp.
 
 ,
 
 671 F.3d 314
 
 , 321 (3d Cir. 2011).
 

 Renfro
 
 ,
 
 671 F.3d at 321
 
 (3d Cir. 2011) (quoting
 
 Mertens
 
 , 508 U.S. at 262,
 
 113 S.Ct. 2063
 
 ).
 

 Conkright v. Frommert
 
 ,
 
 559 U.S. 506
 
 , 517,
 
 130 S.Ct. 1640
 
 ,
 
 176 L.Ed.2d 469
 
 (2010) (quoting
 
 Varity Corp. v. Howe
 
 ,
 
 516 U.S. 489
 
 , 497,
 
 116 S.Ct. 1065
 
 ,
 
 134 L.Ed.2d 130
 
 (1996) );
 
 see also
 

 Fifth Third Bancorp. v. Dudenhoeffer
 
 ,
 
 573 U.S. 409
 
 ,
 
 134 S.Ct. 2459
 
 , 2470,
 
 189 L.Ed.2d 457
 
 (2014) ("Congress sought to encourage the creation of [employee stock ownership plans].").
 

 Id.
 

 (quoting
 
 Rush Prudential HMO, Inc. v. Moran
 
 ,
 
 536 U.S. 355
 
 , 379,
 
 122 S.Ct. 2151
 
 ,
 
 153 L.Ed.2d 375
 
 (2002) ).
 

 Beesley v. Int'l Paper Co.
 
 , No. 06-CV-703,
 
 2014 WL 375432
 
 , at *3 (Jan. 31, 2014).
 

 E.g.
 
 ,
 
 Renfro
 
 ,
 
 671 F.3d at
 
 314 ;
 
 accord
 

 Tibble v. Edison Int'l
 
 ,
 
 831 F.3d 1262
 
 (9th Cir. 2016) ;
 
 Tussey v. ABB, Inc.
 
 ,
 
 746 F.3d 327
 
 (8th Cir. 2014) ;
 
 Hecker v. Deere & Co.
 
 ,
 
 556 F.3d 575
 
 (7th Cir. 2009).
 

 E.g.
 
 ,
 
 Cunningham v. Cornell Univ.
 
 , No. 16-CV-6525,
 
 2019 WL 275827
 
 (Jan. 22, 2019) (considering class certification motion);
 
 Divane v. Nw. Univ.
 
 , No. 16-CV-8157,
 
 2018 WL 1942649
 
 (Apr. 25, 2018) (considering defendants' motion to strike jury demand),
 
 appeal filed
 
 (July 18, 2018);
 
 Clark v. Duke Univ.
 
 , No. 16-CV-1044,
 
 2018 WL 1801946
 
 (Apr. 13, 2018) (considering class certification motion);
 
 Tracey v. Mass. Inst. of Tech.
 
 , No. 16-11620,
 
 2017 WL 4478239
 
 (Oct. 4, 2017) (considering motion to dismiss);
 
 Cates v. Trs. Of Columbia Univ.
 
 , No. 16-CV-6524,
 
 2017 WL 3724296
 
 (Aug. 28, 2017) (considering motion to dismiss);
 
 Sacerdote v. N.Y. Univ.
 
 , No. 16-cv-6284,
 
 2017 WL 3701482
 
 (Aug. 25, 2017) (considering motion to dismiss).
 

 See, e.g.
 
 ,
 
 Krueger v. Ameriprise Fin.
 
 , No. 11-CV-2781,
 
 2015 WL 4246879
 
 , at *4 (July 13, 2015) (approving 33 1/3% fees and additional costs totaling 36% of the common fund);
 
 Nolte v. Cigna Corp.
 
 , No. 07-CV-2046,
 
 2013 WL 12242015
 
 , at *4 (Oct. 15, 2013) (approving 33 1/3% fees and additional costs totaling 36% of the common fund);
 
 George v. Kraft Foods Global, Inc.
 
 , No. 08-CV-3799,
 
 2012 WL 13089487
 
 , at *4 (June 26, 2012) (approving 33 1/3% fees and additional costs totaling 49% of the common fund);
 

 Conkright
 
 ,
 
 559 U.S. at 517
 
 ,
 
 130 S.Ct. 1640
 
 .
 

 Id.
 

 To the extent that
 
 amici
 
 , including the American Council on Education, address this point, I find it persuasive. More importantly, I also believe that this consideration is consistent with the holding in
 
 Renfro
 
 . The majority's primary response to this argument of
 
 amici
 
 is that defendants' alternative would foreclose ERISA liability for any plan with a mix and range of options. I will address this below.
 
 See infra
 
 Part IV.
 

 573 U.S. 409
 
 ,
 
 134 S.Ct. 2459
 
 ,
 
 189 L.Ed.2d 457
 
 (2014).
 

 Maj. Op. at 334.
 

 Fifth Third
 
 ,
 
 134 S.Ct. at 2463, 2467
 
 .
 

 Id.
 

 at 2466
 
 .
 

 29 U.S.C. § 1132
 
 (a)(2).
 

 Perelman v. Perelman
 
 ,
 
 793 F.3d 368
 
 , 373-74 (3d Cir. 2015). As the majority points out,
 
 Perelman
 
 is a defined-benefit case brought under
 
 29 U.S.C. § 1132
 
 (a)(3), and a footnote in
 
 Perelman
 
 does approve of representative suits by plan participants or beneficiaries under § 1132(a)(2). The issue in the instant case, however, is that we do not have sufficient information about the putative representatives to determine whether the harms they are claiming, which do not implicate every Plan participant, have affected them specifically.
 

 "The burden of establishing standing lies with the plaintiff."
 

 Id.
 

 at 373 (citing
 
 Berg v. Obama
 
 ,
 
 586 F.3d 234
 
 , 238 (3d Cir. 2009) ).
 

 Edmonson v. Lincoln Nat'l Life Ins. Co.
 
 ,
 
 725 F.3d 406
 
 , 415 (3d Cir. 2013) (quoting
 
 Lujan v. Defenders of Wildlife
 
 ,
 
 504 U.S. 555
 
 , 560,
 
 112 S.Ct. 2130
 
 ,
 
 119 L.Ed.2d 351
 
 (1992) ).
 

 Id.
 
 at 418 (emphasis added).
 

 App. 39-40.
 

 App. 36 ¶ 8(a);
 
 see, e.g.
 
 ,
 
 Emergency Physicians of St. Clare's v. United Health Care
 
 , No. 14-CV-404,
 
 2014 WL 7404563
 
 , at *4 (D.N.J. Dec. 29, 2014) (dismissing plaintiff's ERISA suit due to lack of standing under
 
 29 U.S.C. § 1132
 
 (a)(2) as the complaint would have required the district court to read additional implied details into a complaint).
 

 As the majority opinion states, an investor is not confined to a single tier. This does not change the fact that no information is provided in the complaint that allows us to identify whether any of the appellees invested in either a relevant fund or a relevant tier.
 

 552 U.S. 248
 
 ,
 
 128 S.Ct. 1020
 
 ,
 
 169 L.Ed.2d 847
 
 (2008).
 

 Id.
 

 at 256
 
 ,
 
 128 S.Ct. 1020
 
 (emphasis added).
 

 Count III's allegation of excessive overall recordkeeping fees implicates all participants and thus survives this analysis, but it still fails for the reasons stated in Part V below.
 

 "Leave to amend is properly denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a renewed motion to dismiss.' "
 
 City of Cambridge Retirement Sys. v. Altisource Asset Mgmt. Corp.
 
 ,
 
 908 F.3d 872
 
 , 878 (3d Cir. 2018) (quoting
 
 Jablonski v. Pan Am. World Airways, Inc.
 
 ,
 
 863 F.2d 289
 
 , 292 (3d Cir. 1988) ).
 

 671 F.3d 314
 
 , 325-28 (3d Cir. 2011).
 

 588 F.3d 585
 
 , 589-90, 596 (8th Cir. 2009) ;
 
 see also
 

 Renfro
 
 ,
 
 671 F.3d at 327
 
 .
 

 556 F.3d 575
 
 , 578-79, 586 (7th Cir. 2009) ;
 
 see also
 

 Renfro
 
 ,
 
 671 F.3d at 326-27
 
 .
 

 Hecker
 
 ,
 
 556 F.3d at 586
 
 .
 

 671 F.3d at 327
 
 .
 

 Renfro
 
 ,
 
 671 F.3d at 327
 
 (quoting
 
 Braden
 
 ,
 
 588 F.3d at
 
 596 ).
 

 Id.
 
 at 328.
 

 Maj. Op. at 329.
 

 See
 

 Renfro
 
 ,
 
 671 F.3d at 327
 
 ("Unlike the pleadings in
 
 Braden
 
 , plaintiffs have not contended there was any sort of concealed kickback scheme ....").
 

 The majority's reliance on
 
 Tibble v. Edison International
 
 ,
 
 843 F.3d 1187
 
 (9th Cir. 2016) ("
 
 Tibble IV
 
 "), is misplaced. To the extent that
 
 Tibble IV
 
 , a Ninth Circuit case, contradicts an opinion of the Third Circuit in
 
 Renfro
 
 , it cannot apply in this case.
 

 Maj. Op. at 332 n.7.
 

 671 F.3d at 327
 
 .
 

 746 F.3d 327
 
 (8th Cir. 2014).
 

 Tussey
 
 ,
 
 746 F.3d at 336
 
 .
 

 Id.
 

 ("The district court found, as a matter of fact, that the ABB fiduciaries [failed to take curative steps] even after ABB's own outside consultant notified ABB the Plan was overpaying for recordkeeping and might be subsidizing ABB's other corporate services.").
 

 To the extent the majority attempts to rely on DOL Advisory Opinion 2013-03A to support its position that revenue sharing reimbursements might be necessary to satisfy the prudent man standard, this reliance is also misplaced. The quoted language in the advisory opinion merely opines on what a fiduciary must do during revenue sharing negotiations in order to satisfy the prudent man standard. DOL Advisory Opinion 2013-03A,
 
 2013 WL 3546834
 
 , at *4 ("Prudence requires that a plan fiduciary, prior to entering into such an arrangement, will understand the formula, methodology and assumptions used by Principal ... following disclosure by Principal of all relevant information pertaining to the proposed arrangement.").