PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3244
_____

JENNIFER SWEDA; BENJAMIN A. WIGGINS; ROBERT
L. YOUNG;
FAITH PICKERING; PUSHKAR SOHONI; REBECCA N.
TONER,
individually and as representatives of a class of participants
and
beneficiaries on behalf of the University of Pennsylvania
Matching Plan,

Appellants

v.

UNIVERSITY OF PENNSYLVANIA; INVESTMENT
COMMITTEE; JACK HEUER
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(E.D. Pa. No. 2-16-cv-04329)
District Judge: Honorable Gene E.K. Pratter

_____

Argued October 2, 2018
Before: SHWARTZ, ROTH, and FISHER, *Circuit Judges*.

(Opinion Filed:  May 2, 2019)

Jerome J. Schlichter
Sean E. Soyars
Kurt C. Struckhoff
Michael A. Wolff    [ARGUED]
Schlichter Bogard & Denton
100 South 4th Street, Suite 1200
St. Louis, MO 63102
        *Counsel for Appellants*


Brian T. Ortelere      [ARGUED]
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Christopher J. Boran
Matthew A. Russell
Morgan Lewis & Bockius
77 West Wacker Drive
Chicago, IL 60601

Michael E. Kenneally
Morgan Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Suite 800 North
Washington, DC 20004
        *Counsel for Appellees*

Brian T. Burgess
Jaime A. Santos
Goodwin Procter
901 New York Avenue, NW
Suite 900 East
Washington, DC 20001

Alison V. Douglass
James O. Fleckner
Goodwin Procter
100 Northern Avenue
Boston, MA 02210
        *Counsel for Chamber of Commerce of The United*
*States of America and American Benefits Council, Amicus*
*Appellees*

Brian D. Netter
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006
        *Counsel for American Association of State Colleges*
*and Universities, American Council on Education,*
*Association of American Universities, Association of*
*Community College Trustees, Association of Public and*
*Land-Grant Universities, College and University*
*Professional Association For Human Resources, Council of*
*Independent Colleges, National Association of Independent*
*Colleges and Universities, Amicus Appellees*

Lori A. Martin
WilmerHale
7 World Trade Center

250 Greenwich Street
New York, NY 10007

Seth P. Waxman
Paul R. Wolfson
WilmerHale
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
*Counsel for Teachers Insurance & Annuity*
*Association of America, Amicus Appellee*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Plaintiffs Jennifer Sweda, Benjamin Wiggins, Robert Young, Faith Pickering, Pushkar Sohoni, and Rebecca Toner, representing a class of participants in the University of Pennsylvania's 403(b) defined contribution, individual account, employee pension benefit plan, sued Defendants, the University of Pennsylvania and its appointed fiduciaries, for breach of fiduciary duty, prohibited transactions, and failure to monitor fiduciaries under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461. Plaintiffs (collectively, "Sweda") alleged that Defendants (collectively, "Penn"), among other things, failed to use prudent and loyal decision making processes regarding investments and administration, overpaid certain fees by up to 600%, and failed to remove underperforming options from the retirement plan's offerings. The District Court dismissed Sweda's complaint in its entirety. We will reverse the District Court's dismissal of the breach of fiduciary duty claims at Counts III and V only

4

and remand for further proceedings.

I.

Sweda and her fellow Plaintiffs-Appellants are current and former Penn employees who participate, or participated, in Penn's retirement plan (the "Plan"). They sought to represent the proposed class of Plan participants, 20,000 current and former Penn employees who had participated in the Plan since August 10, 2010. The Defendants are the University of Pennsylvania, its Investment Committee, and Jack Heuer, the University's Vice President of Human Resources. The Plan is a defined contribution plan under 29 U.S.C. § 1002(34), tax qualified under 26 U.S.C. § 403(b). The University matches employees' contributions up to 5% of compensation.

As a 403(b), the Plan offers mutual funds and annuities: the former through TIAA-CREF and Vanguard Group, Inc. and the latter through TIAA-CREF. Since 2010, the Plan has offered as many as 118 investment options. As of December 2014, the Plan offered 78 options: 48 Vanguard mutual funds, and 30 TIAA-CREF options including mutual funds, fixed and variable annuities, and an insurance company separate account. Effective October 19, 2012, Penn organized its investment fund lineup into four tiers. The TIAA-CREF and Vanguard options under Tier 1 consisted of lifecycle or target-date funds for the "Do-it-for-me" investor. Certain core funds were designated Tier 2, designed for the "Help-me-do-it" investor looking to be involved in his or her investment choices without having to decide among too many options. Under Tier 3, the Plan offered an "expanded menu of funds" for "the more advanced 'mix-my-own' investor," and under Tier 4, the Plan offered the option of a brokerage account window for the "self-directed" investor looking for additional options, subject to additional fees. Plan participants thereafter could "select a

5

combination of funds from any or all of the investment tiers." At the end of 2014, the Plan had $3.8 billion in assets: $2.5 billion invested in TIAA-CREF options, and $1.3 billion invested in Vanguard options.

TIAA-CREF and Vanguard charge investment and administrative (recordkeeping) fees. Mutual fund investment fees are charged as a percentage of a fund's managed assets, known as the expense ratio, and the rate can differ by share class. The mutual funds in which the Plan invests have two share classes: retail and institutional. Retail class shares generally have higher investment fees than institutional class shares. There are also two common recordkeeping fee models. In a flat fee model, recordkeeping fees are a set amount per participant, whereas in a revenue sharing model, part of an option's expense ratio is diverted to administrative service providers. TIAA-CREF and Vanguard charged the Plan under the revenue sharing model.

Sweda alleged numerous breaches of fiduciary duty and prohibited transactions. She brought six counts against all Defendants, and one count against the University. The first six counts alleged breaches of fiduciary duty in violation of 29 U.S.C. § 1104(a)(1) (Counts I, III, and V) and prohibited transactions in violation of 29 U.S.C. § 1106(a)(1) (Counts II, IV, and VI). Sweda also alleged that the University failed to adequately monitor its appointed fiduciaries in Count VII.

Penn moved to dismiss the complaint, and the District Court granted the motion. The court determined that Sweda failed to state a claim for fiduciary breach under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), because her factual allegations could also indicate rational conduct. As for the prohibited transaction claims, the court held that the service agreements

6

could not constitute prohibited transactions without an allegation that Penn had the subjective intent to benefit a party in interest. The court dismissed Count VII after determining that it was duplicative of the claims at Counts I, III, and V.[1] Sweda now appeals.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) and (f). We have jurisdiction under 28 U.S.C. § 1291. We conduct plenary review of an order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure (12)(b)(6). *Renfro*, 671 F.3d at 320; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011).

## III.

A. *Pleadings standards for claims brought under ERISA*

The question in this case is whether Sweda stated a claim that should survive termination at the earliest stage in litigation. When a court grants a motion to dismiss a complaint under Rule 12(b)(6), it deprives a plaintiff of the benefit of the court's adjudication of the merits of its claim before the court considers any evidence. That is why, in exercising our plenary review, we apply the same standard as the district court and construe the complaint "in the light most favorable to the plaintiff," *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 768 F.3d 284, 290 (3d Cir. 2014) (citation and internal quotation marks omitted), to determine

---

[1] Sweda does not address the District Court's dismissal of Count VII in her opening brief. Therefore, the District Court's dismissal of Count VII is not before us on appeal. *Barna v. Bd. of Sch. Dir. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017).

whether it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]e disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012). A claim "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Thompson v. Real Estate Mortg. Network,* 748 F.3d 142, 147 (3d Cir. 2014) (citation and internal quotation marks omitted).

Here, the District Court held that Sweda's complaint did not state a plausible claim, observing at various points in its memorandum that "[a]s in *Twombly*, the actions are at least 'just as much in line with a wide swath of rational and competitive business strategy' in the market as they are with a fiduciary breach." *Sweda v. Univ. of Pennsylvania*, No. CV 16-4329, 2017 WL 4179752, at *7, 8 (E.D. Pa. Sept. 21, 2017) (quoting *Twombly*, 550 U.S. at 554). However, *Twombly*'s discussion of alleged misconduct that is "just as much in line with a wide swath of rational and competitive business strategy" is specific to antitrust cases. 550 U.S. at 554. In an antitrust case, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," therefore "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.

One of our sister circuits has declined to extend *Twombly*'s antitrust pleading rule to breach of fiduciary duty claims under ERISA because "[r]equiring a plaintiff to rule out

8

every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) (citation and internal quotation marks omitted). We agree, and decline to extend *Twombly*'s antitrust pleading rule to such claims. To the extent that the District Court required Sweda to rule out lawful explanations for Penn's conduct, it erred.

We now turn to the task of evaluating Sweda's complaint. We progress in three steps: First, we will note the elements of a claim; second, we will identify allegations that are conclusory and therefore not assumed to be true, and; third, accepting the factual allegations as true, we will view them and reasonable inferences drawn from them in the light most favorable to Sweda to decide whether "they plausibly give rise to an entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).[2] Pleadings that establish only a mere possibility of misconduct do not show entitlement to relief. *Fowler*, 578 F.3d at 211.

In our evaluation of the complaint, we must account for the fact that Rule 8(a)(2), *Twombly*, and *Iqbal* operate with contextual specificity. *Renfro*, 671 F.3d at 321 ("[W]e must examine the context of a claim, including the underlying substantive law, in order to assess its plausibility."). Therefore, ERISA's purpose informs our assessment of Sweda's

---

[2] We have also described this as a two-step analysis, but the task is the same. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (the court (1) separates factual and legal elements of a claim and takes the well-pleaded factual allegations as true, and (2) determines whether those facts state a plausible claim for relief).

pleadings. ERISA's protective function is the focal point of the statute. The statute plainly states that ERISA is a response to "the lack of employee information and adequate safeguards concerning [employee benefit plans'] operation," and adds that ERISA reflects Congress's desire "that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans." 29 U.S.C. § 1001(a). This Court has repeatedly acknowledged and affirmed ERISA's protective function. *See e.g. McCann v. Unum Provident*, 907 F.3d 130, 143 (3d Cir. 2018); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 81 (3d Cir. 2012). ERISA furthers "the national public interest in safeguarding anticipated employee benefits" upon which individuals' livelihoods depend. *Cutaiar v. Marshall*, 590 F.2d 523, 529 (3d Cir. 1979).

ERISA also "represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2470 (2014) (citations and internal quotation marks omitted); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (ERISA "protect[s] and strengthen[s] the rights of employees" and "encourage[s] the development of private retirement plans."). Plan sponsors and fiduciaries have reliance interests in the courts' interpretation of ERISA when establishing plan management practices. ERISA "'induc[es] employers to offer benefits by assuring a predictable set of liabilities.'" *Renfro*, 671 F.3d at 321 (quoting *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002)). Both pursuits—participant protection and plan creation—are important considerations at the pleadings stage.

Two sections of the statute are particularly important to

10

this appeal: the section outlining fiduciary duties, 29 U.S.C. § 1104, and the section prohibiting certain transactions, *id.* § 1106. Under § 1104(a), fiduciaries are held to the prudent man standard of care,[3] which is drawn from trust law. *Tibble v. Edison Int'l* (*Tibble III*), 135 S. Ct. 1823, 1828 (2015); *In re Unisys*, 74 F.3d at 434 ("Congress has instructed that section 1104 'in essence, codifies and makes applicable to … fiduciaries certain principles developed in the evolution of the law of trusts.'") (quoting S. Rep. No. 127, 93 Cong., 2d Sess. (1974)). Section 1104(a) lays the foundation of fiduciary duty, and § 1106(a) "[s]upplement[s] that foundational obligation" by "erect[ing] a categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan." *Nat'l Sec. Sys., Inc.*, 700 F.3d at 82.

The standards for fiduciary conduct in §§ 1104 and 1106 may overlap. When evaluating whether there has been a breach of fiduciary duties under § 1104, courts may consider the administrator's need to "defray[] reasonable expenses of administering [a] plan." 29 U.S.C. § 1104(a)(1)(A)(ii). A prohibited transactions claim under § 1106 might also involve expense-related transactions between a plan and party in interest. *Id.* § 1106(a)(1)(C). Despite the overlap, a fiduciary who breaches the duties under § 1104(a) does not necessarily violate § 1106(a). Because Sweda alleged that Penn breached its fiduciary duties and caused the Plan to engage in prohibited transactions, we will first address claims under § 1104(a)(1)

---

[3] The duties in § 1104(a) fully apply to all fiduciaries except fiduciaries of Employee Stock Ownership Plans (ESOPs). *Fifth Third Bancorp*, 134 S. Ct. at 2467. Neither ESOPs nor the fiduciary duties accompanying them are at issue in this case.

11

(Counts I, III, and V), and then address her claims under § 1106(a)(1) (Counts II, IV, and VI).

B. *Section 1104(a)(1) claims (Counts I, III, and V)*

  1. Elements of a claim under § 1104(a)(1)

   In reviewing the District Court's dismissal of Sweda's fiduciary breach claims, our first task is to identify the elements of such a claim. They are: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), as amended (Dec. 21, 2007). Because the parties do not dispute that Penn is a fiduciary or whether loss was adequately alleged, our focus is whether Sweda adequately alleged that Penn breached its fiduciary duties. A fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1), (a)(1)(A). As explained above, fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). Fiduciaries are also required to diversify investments unless it would be imprudent,[4] and to administer the plan according to governing documents and instruments. *Id.* § 1104(a)(1)(C), (D). Fiduciaries are personally liable for losses due to breach. *Id.* § 1109(a).

   A fiduciary must prudently select investments, and

---

[4] ESOP fiduciaries are exempted from the general duty to diversify. *Fifth Third Bancorp*, 134 S. Ct. at 2467.

failure to "monitor . . . investments and remove imprudent ones" may constitute a breach. *See Tibble III*, 135 S. Ct. at 1828-29; *see also* 29 C.F.R. § 2550.404a-1(b)(1)(i) (fiduciaries must give "appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular investment or investment course of action involved"); *see also Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985) ("investigation of the merits of a particular investment is at the heart of the prudent person standard"). Fiduciaries must also understand and monitor plan expenses. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan," *Tibble III*, 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees. Recognizing the substantial impact of a fiduciary's choice among fee options, the Ninth Circuit, in *Tibble v. Edison Int'l* (*Tibble II*), affirmed the district court's finding that the plan fiduciary's inclusion of retail class shares of three funds when institutional class shares of the same funds were available for 24 to 40 fewer basis points, was a fiduciary breach. 729 F.3d 1110, 1137-39 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015).

Cognizant of the impact of fees on Plan value, fiduciaries should be vigilant in "negotiation of the specific formula and methodology" by which fee payments such as "revenue sharing will be credited to the plan and paid back to the plan or to plan service providers." DOL Advisory Opinion

13

2013-03A, 2013 WL 3546834, at *4.[5] Fiduciaries must also consider a plan's "power . . . to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l* (*Tibble IV*), 843 F.3d 1187, 1198 (9th Cir. 2016). *See Tibble II*, 729 F.3d at 1137 n.24 (common knowledge that investment minimums are often waived for large plans). When expenses are paid from plan assets, fiduciaries must ensure that the assets are used "for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan." DOL Advisory Opinion 2001-01A, 2001 WL 125092, at *1. *See* 29 U.S.C. § 1104(a)(1)(A).

Bearing these fiduciary duties in mind, a court assesses

---

[5] Under ERISA Procedure 76-1 § 10, only the parties described in a request for a DOL advisory opinion may rely on the opinion, and only to the extent that the problem is fully and accurately described in the request. Advisory Op. Procedure, 41 Fed. Reg. 36281-02 (August 27, 1976). The opinions do not have precedential effect. "Because of the nature and limitations of these rulings," the Supreme Court declined to "express [a] view as to whether they are or are not entitled to deference" in *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 162 n.3 (1993). Such advisory opinions are likely "entitled to respect" to the extent that they have the "power to persuade" under the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (citations omitted). *See e.g. Caremark, Inc. v. Goetz*, 480 F.3d 779, 790 (6th Cir. 2007) (deference to DOL advisory opinion was warranted because of the opinion's persuasive force and its consistency with federal and state law and regulations).

a fiduciary's performance by looking at process rather than results, "focusing on a fiduciary's conduct in arriving at [a] . . . decision . . . and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys*, 74 F.3d at 434 (citations omitted). A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. "[A] pure heart and an empty head are not enough." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)). Many allegations concerning fiduciary conduct, such as reasonableness of "compensation for services" are "inherently factual question[s]" for which neither ERISA nor the Department of Labor give specific guidance. DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4-5.

In *Renfro*, we established the pleading standard for breach of fiduciary duty under ERISA after examining the reasoning of other Circuits that had addressed the issue in light of *Twombly* and *Iqbal*, particularly *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), and *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009). The *Renfro* plaintiffs challenged the mix and range of investment options in their retirement plan, the use of asset-based rather than per-participant fees, and the alleged imbalance of the fees charged and services rendered. 671 F.3d at 326. The district court granted defendants' motion to dismiss, holding that "the plan offered a sufficient mix of investments . . . [such] that no rational trier of fact could find, on the basis of the facts alleged in the operative complaint, that the . . . defendants breached an ERISA fiduciary duty by offering [that] particular array of investment vehicles." *Id.* at 320 (citations and internal quotation marks

omitted).

We affirmed. *Id.* at 327-28. We determined that we could not "infer from what [was] alleged that the [fiduciary's] process was flawed." *Id.* at 327 (quoting *Braden*, 588 F.3d at 596). We held that ERISA plans should offer meaningful choices to their participants, and that:

> [T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured.

*Id*. We explained that a fiduciary breach claim must be examined against the backdrop of the mix and range of available investment options. *Id.* We did not hold, however, that a meaningful mix and range of investment options insulates plan fiduciaries from liability for breach of fiduciary duty. Such a standard would allow a fiduciary to avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming. One important reason why we cannot read *Renfro* to establish such a bright-line rule (that providing a range of investment options satisfies a fiduciary's duty) is that ERISA fiduciaries have a duty to act prudently according to current practices—as the statute puts it, the "circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). Practices change over time, and bright line rules would hinder courts' evaluation of fiduciaries'

16

performance against contemporary industry practices. Bearing these things in mind, we turn to Sweda's complaint to determine whether she adequately alleged fiduciary breach in Counts I, III, and V.

### 2. Conclusory allegations of fiduciary breach

First, we must eliminate conclusory allegations from the complaint. *Connelly*, 809 F.3d at 787. Sweda included a few conclusory allegations, such as "a prudent process would have produced a different outcome," Am. Compl. ¶75, but conclusory statements of that variety are rare in the complaint, and after discarding them, many well-pleaded factual allegations remain.

### 3. Well-pleaded facts alleging breach of fiduciary duty

Sweda alleged that Penn was "responsible for hiring administrative service providers, such as a recordkeeper, and negotiating and approving those service providers' compensation." Am. Compl. ¶36. She also alleged that Penn was responsible for the menu of investment options available to participants. *Id.* In Count I, she alleged that Penn entered a "lock-in" agreement with TIAA-CREF that mandated inclusion of the CREF Stock and Money Market accounts, and required the Plan to use TIAA-CREF as a recordkeeper. Am. Compl. ¶86.

In Count III, Sweda alleged that Penn paid excessive administrative fees, failed to solicit bids from service providers, failed to monitor revenue sharing, failed to leverage the Plan's size to obtain lower fees or rebates, and failed to comprehensively review Plan management. Specifically, Sweda alleged that the Plan paid between $4.5 and $5.5 million in annual recordkeeping fees at a time when similar plans paid $700,000 to $750,000 for the same services. Sweda also alleged that percentage-based fees went up as assets grew,

17

despite there being no corresponding increase in recordkeeping services. Sweda alleged that Penn could have negotiated for a cap on fees or renegotiated the fee structure, but failed to do either. Sweda also alleged that Penn could have assessed the reasonableness of Plan recordkeeping fees by soliciting competitive bids, but, unlike prudent fiduciaries, failed to do so. For contrast, Sweda offered examples of similarly situated fiduciaries who acted prudently, such as fiduciaries at Loyola Marymount who hired an independent consultant to request recordkeeping proposals and consolidated services with a single provider. Sweda pointed to similar moves at Pepperdine, Purdue, and CalTech, as well as Caltech's negotiation for $15 million in revenue sharing rebates. Sweda alleged that unlike those organizations, Penn failed to review Plan management, and fell behind other fiduciaries in the industry.

In Count V, Sweda alleged that Penn breached its fiduciary duties by: paying unreasonable investment fees, including and retaining high-cost investment options with historically poor performance compared to available alternatives, and retaining multiple options in the same asset class and investment style. Specifically, Sweda alleged that despite the availability of low-cost institutional class shares, Penn selected and retained identically managed but higher cost retail class shares. She included a table comparing options in

18

the Plan with the readily available cheaper alternatives.[6] Sweda also alleged that some options in the line-up had layers of unnecessary fees. Not only did Sweda allege that the options Penn selected and retained were imprudently costly, she also alleged that they were duplicative thereby decreasing the value of actively managed funds, reducing the Plan's leverage, and confusing participants. Sweda also alleged that 60% of Plan options underperformed appropriate benchmarks, and that Penn failed to remove underperformers. Sweda pointed to the CREF Stock Account and TIAA Real Estate Account as examples of consistent underperformers. She alleged that Penn's process of selecting and managing options must have been flawed if Penn retained expensive underperformers over

---

[6] Most of the investment options Sweda criticized in her complaint were designated as Tier 3 and Tier 4 options. Sweda also criticized Tier 2 options such as the TIAA-CREF International Equity Index Fund, listed in Sweda's table comparing Plan options with their "lower-cost, but otherwise identical" alternatives. Sweda confirmed that criticized options fell under Tiers 2, 3, and 4 at oral argument. Oral Arg. at 7:33. At this time we do not address whether Penn may be able to assert a defense to liability under 29 U.S.C. § 1104(c) due to participants' self-directed investing activity. The § 1104(c) safe harbor defense is an affirmative defense and therefore it is generally not part of a court's consideration of a motion to dismiss under Rule 12(b)(6), except where the defense has been anticipated by a plaintiff's complaint. *Hecker*, 556 F.3d at 588 (citing *In re Unisys*, 74 F.3d at 446 for the classification of § 1104(c) as an affirmative defense). Unlike the plaintiffs in *Hecker* who explicitly and "thoroughly anticipated" the safe harbor defense, Sweda did not "put it in play" at the pleadings stage. *Id.*

better performing, cheaper alternatives. At this stage, her factual allegations must be taken as true, and every reasonable inference from them must be drawn in her favor. *Connelly*, 809 F.3d at 790.

### 4. Sweda plausibly stated a claim in Counts III and V

At this final step, we employ a holistic approach, considering all of Sweda's well-pleaded factual allegations including the range of investment options alongside other germane factors such as reasonableness of fees, selection and retention of investment options, and practices of similarly situated fiduciaries, to determine whether her allegations plausibly demonstrate entitlement to relief. *See Renfro*, 671 F.3d at 327; *see also Braden*, 588 F.3d at 598 (statute's remedial scheme "counsel[s] careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief."). The complaint should not be "parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014) (citing *DiFelice*, 497 F.3d at 420) (courts must look to the totality of the circumstances to assess the prudence of investment decisions).

Sweda plausibly alleged breach of fiduciary duty. Sweda's factual allegations are not merely "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678. As recounted above, they are numerous and specific factual allegations that Penn did not perform its fiduciary duties with the level of care, skill, prudence, and diligence to which Plan participants are statutorily entitled under § 1104(a)(1). Sweda offered specific comparisons between returns on Plan investment options and readily

20

available alternatives, as well as practices of similarly situated fiduciaries to show what plan administrators "acting in a like capacity and familiar with such matters would [do] in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).[7] The allegations plausibly allege that Penn failed to "defray[] reasonable expenses of administering the plan" and otherwise failed to "discharge [its] duties" according to the prudent man standard of care. *Id.* § 1104(a)(1)(A)(ii) and (B).

Other appellate courts have found that similar conduct plausibly indicates breach of fiduciary duty. For instance, in *Tussey v. ABB, Inc.*, the Eighth Circuit held that the district court did not err in finding fiduciaries breached their duties by "[failing to] (1) calculate the amount the Plan was paying [the recordkeeper] for recordkeeping through revenue sharing, (2) determine whether [the recordkeeper's] pricing was competitive, [or] (3) adequately leverage the Plan's size to reduce fees," among other things. 746 F.3d 327, 336 (8th Cir.

---

[7] Sweda also directly compared fees on options included in the Plan with readily available lower-cost options. The dissent suggests that because the range of fees on options included in the Plan is lower than the range of challenged fees in *Renfro*, Sweda needed to allege a change in market circumstances since *Renfro* was decided to state a plausible claim. In making that suggestion, the dissent misses the object of our inquiry, that is, Penn's "conduct in arriving at an investment decision." *In re Unisys*, 74 F.3d at 434 (citations omitted). To that end, the allegations in Sweda's complaint show that Penn frequently selected higher cost investments when identical lower-cost investments were available. This is one of many allegations that, together, plausibly allege that Penn breached its fiduciary duty.

21

2014). In *Tibble IV*, the Ninth Circuit held that whether a fiduciary breached its fiduciary duties by selecting a higher cost share class was an issue requiring development by the district court, and remanded the case for further proceedings. 843 F.3d at 1197-98.

In dismissing the claims in Counts III and V, the District Court erred by "ignor[ing] reasonable inferences supported by the facts alleged," and by drawing "inferences in [Defendants'] favor, faulting [Plaintiffs] for failing to plead facts tending to contradict those inferences." *Braden*, 588 F.3d at 595. While Sweda may not have directly alleged how Penn mismanaged the Plan, she provided substantial circumstantial evidence from which the District Court could "reasonably infer" that a breach had occurred. *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (citation and internal quotation marks omitted). Based on her allegations, the claims in Counts III and V should not have been dismissed.

Penn argues that allowing Sweda to proceed on this complaint ignores fiduciary discretion, and also argues that it in fact employed a prudent process in its Plan management. Finally, Penn argues that reversal would overexpose ERISA fiduciaries to liability. According to Penn, ERISA fiduciaries are "afforded a healthy measure of discretion in deciding what is in the plan participants' interests." Br. of Appellees at 2. At oral argument, Penn emphasized fiduciary discretion, calling it the "hallmark of fiduciary activity." Oral Arg. at 25:05. Penn is not incorrect that the exercise of discretionary authority over plan assets is a characteristic of fiduciaries such that courts can identify fiduciaries by this trait, *see Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 129 (7th Cir. 1992), nor is Penn incorrect that discretion is an important aspect of fiduciary behavior that the courts should consider in evaluating

fiduciary performance. ERISA fiduciaries, like trustees, are afforded discretion because "[t]here are no universally accepted and enduring theories of financial markets or prescriptions for investment that can provide clear and specific guidance," therefore "[v]aried approaches to the prudent investment" of assets are permissible. Restatement (Third) of Trusts § 90 (2007), cmt. f.

However, while fiduciaries have discretion in plan management, that discretion is bounded by the prudent man standard. Discretion "does not mean . . . that the legal standard of prudence is without substantive content or that there are no principles by which the fiduciary's conduct may be guided and judged," rather a fiduciary's conduct at all times "must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *Id.* Fiduciary discretion must be exercised within the statutory parameters of prudence and loyalty. *See* DOL Advisory Op. 2006-08A, 2006 WL 2990326, at *3. Those parameters impose a fiduciary standard that is considered "the highest known to the law." *Tatum*, 761 F.3d at 355–56 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). *See Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (ERISA fiduciary duty may even exceed fiduciary duty as derived from the common law of trusts). Therefore, while we recognize and appreciate fiduciary discretion, if there is indeed a "hallmark" of fiduciary activity identified in the statute, it is prudence. *See* 29 U.S.C. § 1104(a).

As to Penn's second argument, that it did in fact employ a prudent process, this argument goes to the merits and is misplaced at this early stage. Although Penn may be able to demonstrate that its process was prudent, we are not permitted to accept Penn's account of the facts or draw inferences in Penn's favor at this stage of litigation. Finally, we address Penn's argument, supported by amici including the American

Council on Education and the Chamber of Commerce of the United States of America[8], that allowing Sweda's complaint through the 12(b)(6) gate will overexpose plan sponsors and fiduciaries to costly litigation and will discourage them from offering benefit plans at all. Br. of Appellees at 38. Penn predicts that reversal would "give class action lawyers a free ticket to discovery and the opportunity to demand extortionate settlements." *Id.*[9] Penn's solution is to interpret *Renfro* to mean that if a plan fiduciary provides a "mix and range of investment options," plaintiffs cannot plausibly allege breach of fiduciary

---

[8] As well as the American Association of State Colleges and Universities (AASCU), Association of American Universities (AAU), Association of Community College Trustees (ACCT), Association of Public and Land Grant Universities (APLU), College and University Professional Association for Human Resources (CUPA-HR), Council of Independent Colleges (CIC), National Association of Independent Colleges and Universities (NAICU), and the American Benefits Council.

[9] The dissent also expresses concern that reversal will overexpose university sponsors and volunteer fiduciaries to class action claims designed to yield large settlements and significant attorneys' fees. The dissent fears that universities will be less likely to offer benefit plans and fiduciaries less likely to volunteer their services. If that is the case, we should leave it to Congress to address the possibility of a different fiduciary standard that is suitable to the goal of inducing universities to offer plans and would-be fiduciaries to volunteer. As it stands, ERISA fiduciaries are held to one standard under § 1104 and we cannot adjust our pleadings standards to accommodate subcategories of sponsors and fiduciaries.

duty.

The Supreme Court addressed a nearly identical concern in *Fifth Third Bancorp*. There, the defendants "[sought] relief from what they believe[d were] meritless, economically burdensome lawsuits." 134 S. Ct. at 2470. The Court explained that while Congress, through ERISA, sought to encourage creation of retirement plans, that purpose was not intended to prevent participants with meritorious claims from gaining access to the courts. *Id.* While *Fifth Third* concerned an ESOP plan and defendants' request for a presumption of prudence, its reasoning is apt here. Despite our appreciation of Penn and amici's fear of frivolous litigation, if we were to interpret *Renfro* to bar a complaint as detailed and specific as the complaint here, we would insulate from liability every fiduciary who, although imprudent, initially selected a "mix and range" of investment options. Neither the statute nor our precedent justifies such a rule. We will therefore reverse the District Court's dismissal of the claims in Counts III and V, and remand for further proceedings.[10]

---

[10] The dissent argues that we ought to affirm the District Court's dismissal of Count V for Sweda's want of constitutional standing under *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406 (3d Cir. 2013). The dissent argues that because Sweda conceded that most of the underperforming options are in Tiers 3 and 4, the plaintiffs should have included information about whether they invested in Tier 3 or Tier 4 options in the complaint. In the dissent's view, plaintiffs' failure to include that information constitutes a failure to allege an injury in fact. However, while the complaint does not identify plaintiffs' investment options by tier, it does contain facts that indicate that the named plaintiffs invested in the underperforming investment options. In a paragraph entitled

> To the extent the Plaintiffs must also show an individual injury . . . each Plaintiff has suffered such an injury, in at least the following ways . . . The named Plaintiffs' individual accounts in the Plan were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in underperforming options including the CREF Stock and TIAA Real Estate accounts[.]

App. 36-37. This allegation links the named plaintiffs with the underperforming investment options and is sufficient to show individual injuries.

In light of the dissent's point on constitutional standing, we should address the issue as it pertains to participants and beneficiaries who bring a civil action against fiduciaries under 29 U.S.C. § 1132(a)(2). The dissent cites this Court's decision in *Perelman v. Perelman*, where we held that participants in a defined benefit plan could not show actual injury for constitutional standing for an § 1132(a)(3) claim by pointing to a "diminution of plan assets" because such participants are entitled to a fixed periodic payment rather than part of the asset pool. 793 F.3d 368, 374 (3d Cir. 2015). We also noted that "[t]here is no question that representative suits by plan

26

We will affirm dismissal of Count I because it is time barred. *Fairview Twp. v. U.S. Envtl. Prot. Agency*, 773 F.2d 517, 525 n.15 (3d Cir. 1985) (we may affirm on any basis). Sweda limited her claim to the initial agreement between the Plan and TIAA-CREF to include the CREF Stock and Money Market accounts in the Plan, and to use TIAA-CREF for recordkeeping. This agreement was entered into prior to December 31, 2009, and Sweda filed her initial complaint on August 10, 2016. Sweda did not present this claim as an ongoing breach like the petitioners in *Tibble III*, 135 S. Ct. 1823. Although we must draw every reasonable inference in Sweda's favor, we will not read factual allegations into a complaint. Count I is therefore time barred under the six-year statute of limitations. 29 U.S.C. § 1113(1).[11]

---

participants or beneficiaries against fiduciaries for breach of fiduciary duty are permitted by, and generally brought under, ERISA § [1132(a)(2)]." *Id.* at 376 n.6. This case implicates the latter part of our observation in *Perelman* because Sweda brought this suit under § 1132(a)(2) on behalf of the Plan.

[11] No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation. 29 U.S.C. § 1113.

C. *Section 1106(a)(1) claims (Counts II, IV, and VI)*

1. Elements of a claim under § 1106(a)(1)

Section 1106(a) supplements the fiduciary duties by specifically prohibiting certain transactions between plans and parties in interest. The elements of a party-in-interest, prohibited transaction claim are: (1) the fiduciary causes (2) a listed transaction to occur (3) between the plan and a party in interest. 29 U.S.C. § 1106(a)(1). ERISA defines "party in interest" as "a person providing services to such plan." 29 U.S.C. § 1002(14)(B). Sweda argues that TIAA-CREF and Vanguard are parties in interest according to the plain language of § 1002(14)(B). She also points to a Department of Labor advisory opinion holding that a life insurance company that provided recordkeeping and related services to a retirement plan would be a party in interest under the statute. *See* DOL Advisory Opinion 2013-03A, 2013 WL 3546834. Importantly, an investment company does not become a party in interest merely because a plan invests in securities issued by the investment company. 29 U.S.C. § 1002(21)(B).

Fiduciaries are prohibited from causing a plan to engage in the transactions listed at § 1106(a)(1). Those transactions are:

> (A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a party in interest, of any

28

> assets of the plan; or (E)
> acquisition, on behalf of the plan,
> of any employer security or
> employer real property in violation
> of section 1107(a) of this title.

Between the definition of service providers as parties in interest, *id.* § 1002(14)(B), and this exhaustive list of prohibited transactions, § 1106(a)(1) could be read to have an extremely broad application. Some courts have embraced that breadth and interpreted § 1106(a)(1) to prohibit almost any transaction with a party in interest. The Seventh Circuit, for example, has held that § 1106(a)(1) creates a per se rule against party in interest transactions, so that plaintiffs who allege such transactions may do so without even pleading unreasonableness of fees. *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 676 (7th Cir. 2016). In *Allen*, the Seventh Circuit ruled that the exemptions from prohibited transactions, under 29 U.S.C. § 1108, are affirmative defenses, and that "plaintiff[s] ha[ve] no duty to negate any or all of them" in a complaint. *Id.* It also noted that five other circuits (the Second, Fourth, Fifth, Eighth, and Ninth) have ruled similarly. *Id. See Braden*, 588 F.3d at 600-01 (plaintiff did not have to plead facts "raising a plausible inference that the payments were unreasonable" because exemption in § 1108 is a defense raised by defendant). Responding to concerns about a flood of prohibited transaction claims, the Seventh Circuit reasoned that Rule 11 sanctions and reasonable risk aversion would prevent the floodgates from opening. *Allen*, 835 F.3d at 677.

We decline to read § 1106(a)(1) as the Seventh Circuit does because it is improbable that § 1106(a)(1), which was designed to prevent "transactions deemed likely to injure the . . . plan" and "self-dealing," *Nat'l Sec. Sys., Inc.*, 700 F.3d at 92 (citation and internal quotation marks omitted), would prohibit

29

ubiquitous service transactions and require a fiduciary to plead reasonableness as an affirmative defense under § 1108 to avoid suit. Not even Sweda advocates for such a broad reading of § 1106(a)(1), conceding in her complaint that "paying for recordkeeping with asset-based revenue sharing is not [a] *per se* violation of ERISA." Am. Compl. ¶101. One of the reasons we do not find *Allen* persuasive is that the transactions the Seventh Circuit scrutinized in *Allen* were a far cry from the ordinary service arrangements at issue here. In *Allen*, an ESOP fiduciary bought the employer's stock using a loan financed by the principal shareholders of the company. The value of the stock then fell so drastically that "[t]he Plan's participants, all employees of [the company], wound up being on the hook for interest payments on the loan." *Allen*, 835 F.3d at 673. A transaction of that variety is far removed from ordinary recordkeeping arrangements. Therefore, *Allen* does not provide sufficient justification to recognize a per se rule that every furnishing of goods or services between a plan and party in interest is a prohibited transaction under § 1106(a)(1).

Our ruling today does not conflict with our earlier decisions holding that transactions between a plan and plan fiduciaries are per se prohibited under § 1106(b). *See Cutaiar*, 590 F.2d at 528; *see also Nat'l Sec. Sys., Inc.*, 700 F.3d at 94. In *Cutaiar*, we held that "[w]hen identical trustees of two employee benefit plans whose participants and beneficiaries are not identical effect a loan between the plans without a [§ 1108] exemption, a per se violation of ERISA exists" under § 1106(b)(2). 590 F.2d at 529. In *National Security Systems*, we held that a transaction between a plan and fiduciary that is tainted by self-dealing is a per se violation of § 1106(b)(3) "regardless of the reasonableness of compensation." 700 F.3d at 93. Those cases do not control here because § 1106(a) and (b) have distinct purposes: "[s]ubsection (a) erects a

30

categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan," and "[s]ubsection (b) prohibits plan fiduciaries from entering into transactions with the plan tainted by conflict-of-interest and self-dealing concerns." *Id.* at 82. The protective function of ERISA is at its height in the latter scenario when there is a risk of fiduciary self-dealing. The instances where participants might benefit from a transaction between a plan and a fiduciary are so rare that they can be prohibited outright.

Reading § 1106(a)(1) as a per se rule barring all transactions between a plan and party in interest would miss the balance that Congress struck in ERISA, because it would expose fiduciaries to liability for every transaction whereby services are rendered to the plan. *See Renfro*, 671 F.3d at 321 ("In enacting ERISA, Congress 'resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs.'" (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993))). Additionally, if we interpreted § 1106(a)(1) to prohibit every transaction for services to a plan, we would have to ignore other parts of the statute. For instance, ERISA specifically acknowledges that certain services are necessary to administer plans. *See* 29 U.S.C. § 1104(a)(1)(A)(ii). Interpreting § 1106(a)(1) to prohibit necessary services would be absurd, and when one interpretation of a statute leads to an absurd result, we may consider an alternative interpretation that avoids the absurdity. *Thorpe v. Borough of Jim Thorpe*, 770 F.3d 255, 263 (3d Cir. 2014) (quoting *First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 402 (3d Cir. 1999)). Therefore we decline to interpret § 1106(a)(1) as prohibiting per se the "furnishing of goods [or] services," 29 U.S.C. § 1106(a)(1)(C), by all "person[s] providing services to [the] plan," *id.*

31

§ 1002(14)(B).[12]

The Supreme Court similarly avoided absurdity in its interpretation of § 1106(a)(1) in *Lockheed Corp.* (addressing whether the administrator of a plan could condition payment on performance by participants). The Court held that payments of benefits to a participant, which under a hyper-literal reading of the statute could be understood as "a transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D), was not a prohibited transaction. *Lockheed Corp.*, 517 U.S. at 892-93. The Supreme Court rejected the hyper-literal reading because it would have been absurd and illogical in the context of the statute. *Id.* The Court went through the subsections of § 1106(a)(1), listing the different statutorily prohibited transactions, and explained that they follow a common thread: they are all "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Id.* at 893. The Court distinguished payment of plan benefits because they "cannot reasonably be said to share that characteristic." *Id.*

We have interpreted § 1106(a)(1)(D) similarly, holding that a violation occurs when: (1) a fiduciary, (2) causes a plan to engage in a transaction, (3) that uses plan assets, (4) for the

---

[12] Moreover, § 1106(a) was not designed to prevent negotiation between unaffiliated parties. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). Thus, if a service provider has no prior relationship with a plan before entering a service agreement, the service provider is not a party in interest at the time of the agreement. As explained herein, it only becomes a party in interest after the initial transaction occurs, and subsequent transactions are not prohibited absent self-dealing or disloyal conduct.

benefit of a party in interest, and (5) "the fiduciary 'knows or should know' that elements three and four are satisfied." *Reich v. Compton*, 57 F.3d 270, 278 (3d Cir. 1995). In *Reich*, we held that specific intent is required because of the plain meaning of the statutory phrase "for the benefit," and also because if § 1106(a)(1)(D) did not require "subjective intent to benefit a party in interest, [it] would produce unreasonable consequences that we feel confident Congress could not have wanted." *Id.* at 279.

The Supreme Court's identification of the common thread in § 1106(a)(1), a special risk to the plan from a transaction presumably not at arm's length—and its determination that transactions that do not share that common thread are permissible—as well as our interpretation of § 1106(a)(1)(D), represent a more harmonious way to interpret the prohibited transactions listed in § 1106(a)(1) in the context of the statute as a whole. The element of intent to benefit a party in interest effects the purpose of § 1106(a)(1), which is to rout out transactions that benefit such parties at the expense of participants. Section 1106(a)(1) is not meant to impede necessary service transactions, but rather transactions that present legitimate risks to participants and beneficiaries such as "securities purchases or sales by a plan to manipulate the price of the security to the advantage of a party-in-interest." *Leigh v. Engle*, 727 F.2d 113, 127 (7th Cir. 1984) (quoting H.R. Conf. Rep. No. 1280, 93rd Cong., 2d Sess. 308) (alteration omitted). We therefore hold that absent factual allegations that support an element of intent to benefit a party in interest, a plaintiff does not plausibly allege that a "transaction that constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest" prohibited by § 1106(a)(1)(C) has occurred. Requiring plaintiffs to allege facts supporting this element avoids absurdity in interpreting

the statute.

### 2. Conclusory and well-pleaded factual allegations of prohibited transactions

The factual allegations that Sweda included in her complaint to support her claims for prohibited transactions overlap with the allegations supporting her fiduciary breach claims. Besides the allegations recounted above, Sweda alleged that revenue sharing was "kicked back" to TIAA-CREF for recordkeeping associated with TIAA-CREF options. Am. Compl. ¶109. She alleged that Penn "allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement." Am. Compl. ¶87. She also alleged that Penn failed to act in the exclusive interest of participants, instead "serv[ing] TIAA-CREF's and Vanguard's financial interests" with decisions such as "allowing TIAA-CREF and Vanguard to put their proprietary investments in the Plan without scrutinizing those providers' financial interest." Am. Compl. ¶¶112, 200. These general allegations about kickbacks and prioritizing TIAA-CREF and Vanguard's financial interests over the participant and beneficiaries' financial interests are largely conclusory, but we also consider well-pleaded factual allegations summarized at § III.B.3 that are relevant to Sweda's prohibited transaction claims.

### 3. Sweda failed to plausibly state a claim under Counts II, IV, and VI

Looking at the totality of the allegations in the complaint, taken as true, *Connelly*, 809 F.3d at 787, Sweda failed to state a plausible claim for prohibited transactions in Counts II, IV, and VI.

#### a. Count II

In Count II, Sweda alleged that a prohibited transaction

34

occurred when Penn allowed TIAA-CREF to require inclusion of CREF Stock and Money Market accounts among the Plan's investment options and agreed to TIAA-CREF recordkeeping services, pursuant to a "lock-in" agreement. Am. Compl. ¶193. Two of Sweda's prohibited transaction claims emanate from this agreement: (1) that a prohibited transaction occurred at the time of the initial agreement, and (2) that a prohibited transaction occurred every time fees were later paid pursuant to the agreement. As to the initial agreement, Sweda did not sufficiently allege that TIAA-CREF was a party in interest at that time: she included no allegation that TIAA-CREF was "providing services to [the] plan," 29 U.S.C. § 1002(14)(B). Because Sweda failed to allege that TIAA-CREF was a party in interest at the time of the "lock-in," that element is factually unsupported, and she failed to state a claim for the first alleged prohibited transaction in Count II. Sweda's second claim in Count II that prohibited transactions occurred every time property was exchanged or services were rendered pursuant to the "lock-in" agreement is so closely related to Count IV (payment of recordkeeping fees) that we will address these claims together.

### b. Counts II and IV

In Counts II and IV, Sweda alleged that Penn caused the Plan to enter prohibited transactions when it caused the Plan to pay administrative fees to TIAA-CREF and Vanguard. Sweda plausibly alleged that TIAA-CREF and Vanguard were parties in interest under § 1002(14)(B) because they provided services to the plan at the time fees were paid, and Penn's own Plan materials identify TIAA-CREF and Vanguard as parties in interest. At the pleadings stage, we must assume that this well-pleaded fact is true. Next we look to whether Penn caused the Plan to enter a prohibited transaction with TIAA-CREF or Vanguard for administrative fees. Sweda alleged that the

35

administrative fee payments constituted prohibited transactions under § 1106(a)(1) in three ways: (1) they were prohibited transfers of property under § 1106(a)(1)(A), (2) they were transfers of assets under subsection (D), and (3) they constituted furnishing of services under subsection (C). We first address whether Sweda plausibly alleged that administrative fee payment by revenue sharing constituted a transfer of property under (A) or Plan assets under (D).

Sweda alleged that administrative fees were paid by revenue sharing. Am. Compl. ¶¶ 46, 110 (Vanguard is "compensated for recordkeeping services based on internal revenue sharing it receives from the Vanguard Investor share class mutual funds."). She also alleged that investment fees were drawn from mutual fund assets. Am. Compl. ¶44. ("Mutual fund fees are usually expressed as a percentage of assets under management . . . [t]he fees deducted from a mutual fund's assets . . ."). Mutual fund assets are distinct from Plan assets, because, under the statute, assets of "a plan which invests in any security issued by an investment company" do not "include any assets of such investment company." 29 U.S.C. § 1101(b)(1). *See Hecker*, 556 F.3d at 584 (With support from the Department of Labor, defendants demonstrated that revenue sharing fees did not impinge plan assets because they were drawn from the assets of mutual funds). Therefore, Sweda did not plausibly allege that revenue sharing involved a transfer of Plan property or assets under § 1106(a)(1)(A) or (D), and furthermore, Sweda did not plausibly allege that Penn had subjective intent to benefit a TIAA-CREF or Vanguard by a use or transfer of Plan assets, which, under our precedent, is required to state a claim under § 1106(a)(1)(D). *Reich*, 57 F.3d at 279.

Finally, we must address whether a prohibited transaction occurred under § 1106(a)(1)(C), the prohibition of

36

"furnishing of goods, services, or facilities between the plan and a party in interest." As we explained above, it is possible to read subsection (C) to create a per se prohibited transaction rule forbidding service arrangements between a plan and a party rendering services to the plan. However, because reading § 1106(a)(1)(C) to that end would be absurd, Sweda must plead an element of intent to benefit the party in interest. After striking conclusory allegations, such as "Defendants served TIAA-CREF's and Vanguard's financial interests" (Am. Compl. ¶112) from the complaint, we do not find that Sweda alleged facts showing that Penn intended to benefit TIAA-CREF or Vanguard. We will affirm the dismissal of Sweda's claims for prohibited transactions under Counts II and IV.

### c. Count VI

At Count VI, Sweda alleged that Penn caused the Plan to engage in prohibited transactions when it caused the Plan to pay investment fees to TIAA-CREF and Vanguard. For similar reasons that Sweda did not plausibly allege prohibited transactions in Counts II and IV, she also failed to plausibly allege prohibited transactions in Count VI. First, Sweda did not plausibly allege that payment of investment fees constituted a prohibited transaction under § 1106(a)(1)(A), because Sweda alleged that investment fees were drawn from mutual fund assets, not Plan assets. Second, for the same reason, investment fees were not plausibly alleged to be a transfer of assets of the Plan under § 1106(a)(1)(D). Third, Sweda did not allege that Penn intended to benefit TIAA-CREF or Vanguard under § 1106(a)(1)(D), as required by our precedent. *Reich*, 57 F.3d at 279. Finally, as we explained above in our discussion of Counts II and IV, in order to state a claim for prohibited transactions under § 1106(a)(1)(C), "furnishing goods, services, or facilities between the plan and a party in interest," a plaintiff must allege intent to benefit a party in interest.

Sweda failed to do so. Therefore, we will affirm the dismissal of the claim for prohibited transactions under Count VI.

IV.

Sweda plausibly alleged that Penn failed to conform to the high standard required of plan fiduciaries under 29 U.S.C. § 1104(a)(1). However, she did not plausibly allege that Penn caused the Plan to enter prohibited transactions under § 1106(a)(1). We therefore will REVERSE the portion of the District Court's order granting the Appellees' motion to dismiss Counts III and V and remand for further proceedings. We will AFFIRM the District Court's order dismissing Counts I, II, IV, VI, and VII.

*Sweda v. University of Pennsylvania*,
No. 17-3244

ROTH, Senior Judge, concurring in part and dissenting in part:

Like many large employers, the University of Pennsylvania maintains a retirement plan for its employees. Between 2009 and 2014, the plan's assets increased in value by $1.6 billion, a 73% return on investment. Despite this increase, plaintiffs have filed a putative class action, claiming that the plan's fiduciaries have imprudently managed it and seeking tens of millions of dollars of damages. Having convinced this Court to reverse in part the District Court's dismissal of the action, the plaintiffs will continue to pursue their remaining claims, which will be litigated extensively, at large cost to the university. As a result, the university is in an unenviable position, in which it has every incentive to settle quickly to avoid (1) expensive discovery and further motion practice, (2) potential individual liability for named fiduciaries,[1] and (3) the prospect of damages calculations, after lengthy litigation, with interest-inflated liability totals.

This pressure to settle increases with the size of the plan, regardless of the merits of the case. Alleged mismanagement of a $400,000 plan will expose fiduciaries to less liability than mismanagement of a $4 billion plan. Thus, notwithstanding the strength of the claims, a plaintiff's attorney, seeking a large fee, will target a plan that holds abundant assets. I am

---

[1] *Sec'y, U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 91–92 (3d Cir. 2017).

concerned that this is the case both here and in numerous other lawsuits that have targeted large corporations and universities that administer some of the largest retirement plans in the country.[2]

This strategy has substantial consequences for fiduciaries of these plans, particularly at universities. While the fiduciaries for large corporations may have experience in dealing with potential liabilities, fiduciaries at universities are often staff members who volunteer to serve in these roles.[3] Even though indemnification agreements exist for these individual members, as long as they are party to the suit they will be required to disclose this litigation in personal financial transactions.[4] Moreover, universities, which unlike large

---

[2] For a representative sample of cases plaintiffs' counsel has brought against corporations and universities respectively, see *infra* notes 26–27.

[3] While this suit does not name the members of the Investment Committee as defendants, and the record does not specify the members of the Investment Committee or their roles within the university, other suits name staff members as individual defendants. *E.g.*, *Tracey v. Mass. Inst. Of Tech.*, No. 16-11620, 2017 WL 4453541 (Aug. 31, 2017), *adopted in part and rejected in part*, 2017 WL 4478239 (Oct. 4, 2017).

[4] *See Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2018 WL 1088019, at *1 (Jan. 19, 2018) ("Plaintiffs shall address why they need to name 29 additional individuals as defendants other than (a) they think they can; and (b) the assertion of multi-million dollar claims against these individuals who served on a committee at their employer's request has the tremendous power to harass these individuals because they will be required

2

corporations are not typically in the business of profitmaking, must keep in mind, when determining how best to proceed in litigation, that the university will be responsible for any damages award. This reality demands that cases such as this one be carefully scrutinized in order not to permit implausible allegations to result in a large settlement, under which a substantial portion of the funds that are to be reimbursed to retirement plans are instead diverted to attorneys' fees.

Ultimately, this case presents a question virtually identical to the one addressed by this Court seven years ago, in *Renfro v. Unisys Corp.*[5]: Does an ERISA plan fiduciary acting in good faith, under the prudent person standard, have a duty to do more than provide a wide, reasonable, and low-cost variety of investment options for individual plan beneficiaries who want to have control over their own investment portfolio? Plaintiffs contend that because the pleadings have identified specific problematic funds in the mix and range offered by defendants, the answer should be yes. The majority agrees, holding that the administrators of a pension plan must ensure that sophisticated investors receive the best version of each plan available. This departs from the core principles in *Renfro*, set out above, which the District Court followed faithfully. For these reasons, I would affirm in full the District Court's dismissal of the amended complaint.

---

to list the lawsuit on every auto, mortgage or student financial aid application they file.").
[5] 671 F.3d 314, 327–28 (3d Cir. 2011).

I

The Plan, as explained by the District Court, is a defined-contribution plan that offers its beneficiaries four levels of involvement in their investments. The first tier is a "do-it-for-me" tier, where investors have their choice between a TIAA target fund and a Vanguard target fund, which funds automatically adjust their investment strategy with no input from the beneficiary, based on an expected retirement date. Tier 2 is a "help-me-do-it" tier, which allows a beneficiary to select from a group of eight options and weigh them as preferred. The third tier is a "mix-my-own" tier, which provides a few options for each of nine types of funds. And finally, Tier 4 is a "self-directed" tier, which provides access to the full panoply of 78 funds offered by defendants.[6]

Of these 78 investment options, virtually all are mutual funds. Over the course of the class period, the proportion of retail-class mutual funds, as opposed to cheaper institutional-class mutual funds, has varied. Appellants have specifically challenged 58 of these retail-class funds as having had cheaper but otherwise identical institutional-class analogues at some point during the class period (Count V). Defendants note in this connection that dozens of funds have been switched to institutional classes over time. Plaintiffs also challenge the method in which fees are calculated (Count III), stating that an asset-based calculation has overcompensated the record keepers and that a failure to negotiate rebates constituted a breach of fiduciary duty.

---

[6] Before October 2012, forty additional funds were included in this tier, for a total of 118.

4

At argument, when asked about the four separate tiers of beneficiary involvement, plaintiffs stated that the funds being challenged were largely related to Tiers 3 and 4, and in a follow-up response, specifically excluded Tier 1 from the scope of the complaint.

## II

It is well established that ERISA was intended to be a "comprehensive and reticulated" statute[7] enacted after "a decade of congressional study of the Nation's private employee benefit system."[8]  ERISA "resolved innumerable disputes between powerful competing interests—a balance between encouraging the creation of plans and ensuring enforcement of rights under a plan."[9]  Congress intended to create a system "that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place."[10]  Instead, ERISA's purpose is, in part, to "assur[e] a predictable set of

---

[7] *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002).

[8] *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 768 F.3d 284, 291 (3d Cir. 2014) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)); *accord Renfro v. Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011).

[9] *Renfro*, 671 F.3d at 321 (3d Cir. 2011) (quoting *Mertens*, 508 U.S. at 262).

[10] *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)); *see also Fifth Third Bancorp. v. Dudenhoffer*, 134 S. Ct. 2459, 2470 (2014) ("Congress sought to encourage the creation of [employee stock ownership plans].").

liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred."[11]

Plaintiffs' counsel, "one of the few firms handling ERISA class actions such as this,"[12] have brought numerous ERISA suits across the country. While these cases were at first limited to corporate retirement plans,[13] they have expanded to include several suits against university retirement plans.[14] These cases typically are not litigated to conclusion, either

---

[11] *Id.* (quoting *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002)).

[12] *Beesley v. Int'l Paper Co.*, No. 06-CV-703, 2014 WL 375432, at *3 (Jan. 31, 2014).

[13] *E.g.*, *Renfro*, 671 F.3d at 314; *accord Tibble v. Edison Int'l*, 831 F.3d 1262 (9th Cir. 2016); *Tussey v. ABB, Inc.*, 746 F.3d 327 (4th Cir. 2014); *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009).

[14] *E.g.*, *Cunningham v. Cornell Univ.*, No. 16-CV-6525, 2019 WL 275827 (Jan. 22, 2019) (considering class certification motion); *Divane v. Nw. Univ.*, No. 16-CV-8157, 2018 WL 1942649 (Apr. 25, 2018) (considering defendants' motion to strike jury demand), *appeal filed* (July 18, 2018); *Clark v. Duke Univ.*, No. 16-CV-1044, 2018 WL 1801946 (Apr. 13, 2018) (considering class certification motion); *Tracey v. Mass. Inst. of Tech.*, No. 16-11620, 2017 WL 4478239 (Oct. 4, 2017) (considering motion to dismiss); *Cates v. Trs. Of Columbia Univ.*, No. 16-CV-6524, 2017 WL 3724296 (Aug. 28, 2017) (considering motion to dismiss); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284, 2017 WL 3701482 (Aug. 25, 2017) (considering motion to dismiss).

6

terminating through settlement or a judicial finding against the plaintiffs.

Given that these cases are brought as putative class actions, counsel is able to petition the court for fees after a successful settlement. In cases of successful settlements, counsel, upon petition, are often awarded one third of the settlement amount, plus expenses, from the settlement fund.[15] While benefits to the plan may result from the settlement, they are substantially diluted by the fees' calculation, even before considering the litigation costs that the universities shoulder through the motion to dismiss stage. Indeed, while there is no comprehensive listing of "jumbo plans" maintained in this country, this pattern of bringing class actions against large funds seems to have sustained itself and could continue as long as more plans can be identified.

Such a result would be the opposite of "assuring a predictable set of liabilities, under uniform standards of primary conduct."[16] Indeed, it would not only discourage the offering of these plans, but it would also discourage

---

[15] *See, e.g.*, *Krueger v. Ameriprise Fin.*, No. 11-CV-2781, 2015 WL 4246879, at *4 (July 13, 2015) (approving 33 1/3% fees and additional costs totaling 36% of the common fund); *Nolte v. Cigna Corp.*, No. 07-CV-2046, 2013 WL 12242015, at *4 (Oct. 15, 2013) (approving 33 1/3% fees and additional costs totaling 36% of the common fund); *George v. Kraft Foods Global, Inc.*, No. 08-CV-3799, 2012 WL 13089487, at *4 (June 26, 2012) (approving 33 1/3% fees and additional costs totaling 49% of the common fund);

[16] *Conkright*, 559 U.S. at 517.

"individuals from serving as fiduciaries."[17] Therefore, in enforcing the pleading standards under *Twombly* and *Iqbal*, courts must take great care to allow only plausible, rather than possible, claims to withstand a motion to dismiss.[18] While the majority takes great care to lay out the pleading standards that govern this dispute, for the reasons stated below, I disagree that those standards have been met.

The majority cites *Fifth Third Bancorp v. Dudenhoeffer*[19] to support discarding any concern of encouraging attorney-driven litigation, despite its "appreciation of Penn and amici's fear of frivolous litigation."[20] But *Fifth Third* concerned an employee stock ownership plan, under which employees invested primarily in the stock of their employer, a plan that the majority points out is subject to distinct duties under 29 U.S.C. § 1104(a).[21] The defendants in that case were arguing for a special presumption that investments in the employer's stock would be prudent unless the employer was in dire financial straits.[22] No such

---

[17] *Id.*

[18] To the extent that *amici*, including the American Council on Education, address this point, I find it persuasive. More importantly, I also believe that this consideration is consistent with the holding in *Renfro*. The majority's primary response to this argument of *amici* is that defendants' alternative would foreclose ERISA liability for any plan with a mix and range of options. I will address this below. *See infra* Part IV.

[19] 134 S. Ct. 2459 (2014).

[20] Maj. Op. at 25.

[21] *Fifth Third*, 134 S. Ct. at 2463, 2467.

[22] *Id.* at 2466.

8

presumption is necessary here to determine under *Renfro* that plaintiffs' claims were properly dismissed.

For the above reasons, I conclude that the District Court's analysis of this case, following *Renfro*, was the correct one.

III

Turning then to a more pragmatic concern with the pleading here, ERISA states that a civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary."[23] This statutory edict, however, does not override the constitutional requirements for standing.[24] In order for a plaintiff to carry her burden of establishing constitutional standing,[25] three elements must be met: (1) an injury in fact "that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical", (2) a causal connection between that injury and the conduct so that the

---

[23] 29 U.S.C. § 1132(a)(2).

[24] *Perelman v. Perelman*, 793 F.3d 368, 373–74 (3d Cir. 2015). As the majority points out, *Perelman* is a defined-benefit case brought under 29 U.S.C. § 1132(a)(3), and a footnote in *Perelman* does approve of representative suits by plan participants or beneficiaries under § 1132(a)(2). The issue in the instant case, however, is that we do not have sufficient information about the putative representatives to determine whether the harms they are claiming, which do not implicate every Plan participant, have affected them specifically.

[25] "The burden of establishing standing lies with the plaintiff." *Id.* at 373 (citing *Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009)).

9

injury is fairly traceable to the defendant's action, and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[26] We have held that "an ERISA beneficiary suffers an injury-in-fact . . . when a defendant allegedly breaches its fiduciary duty, profits from the breach, and the beneficiary, as opposed to the plan, has an *individual* right to the profit."[27]

Plaintiffs allege that the Plan's use of the 58 retail-class funds that had cheaper institutional-class analogues caused an injury in fact sufficient to confer standing for Count V. They do not, however, automatically have an individual right to the alleged lost profits simply because they are participants in the Plan broadly. At argument, plaintiffs specifically conceded that Tier 1 did not include any of the 58 funds challenged in Count V; plaintiffs limited their focus in Count V to Tiers 3 and 4. Therefore, in order for plaintiffs to carry the burden of proof that they were injured by the selection of the 58 retail-class funds, they must plead that they were participants in Tier 3 or Tier 4. They have not done so here.

The amended complaint does not contain facts that link any of the named plaintiffs to any tier at any point during the class period. While a paragraph in the complaint is devoted to each of the six plaintiffs, each of those paragraphs consists of three sentences. The first lists the plaintiff's name and residence, the second states the plaintiff's job title, and the third sentence is as follows, with changes only for gender: "She is

---

[26] *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).
[27] *Id.* at 418 (emphasis added).

10

a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan."[28] This averment indicates merely that plaintiffs are participants under the definition of § 1132(a)(2). It provides no information as to which tier, or tiers, any individual plaintiff chose for investment. Indeed, the entire record contains no direct information on this point. Plaintiffs conceded this at oral argument. The "standing" portion of the amended complaint does imply that plaintiffs invested in ways consistent with being in a more active investment tier, but it does so by alleging generally that "the named Plaintiffs and all participants in the Plan suffered financial harm" as a result of defendants conduct alleged in Count V.[29] This cannot be sufficient.[30]

This language in the amended complaint appears to mirror its citation to *LaRue v. DeWolff, Boberg & Assocs.* to support standing here.[31] However, *LaRue* does not save plaintiffs. The two situations in *LaRue* that the Supreme Court

---

[28] App. 39–40.

[29] App. 36 ¶ 8(a); *see, e.g.*, *Emergency Physicians of St. Clare's v. United Health Care*, No. 14-CV-404, 2014 WL 7404563, at *4 (D.N.J. Dec. 29, 2014) (dismissing plaintiff's ERISA suit due to lack of standing under 29 U.S.C. § 1132(a)(2) as the complaint would have required the district court to read additional implied details into a complaint).

[30] As the majority opinion states, an investor is not confined to a single tier. This does not change the fact that no information is provided in the complaint that allows us to identify whether any of the appellees invested in either a relevant fund or a relevant tier.

[31] 552 U.S. 248 (2008).

held to constitute cognizable claims under § 1132(a)(2) were instances when "a fiduciary breach diminishes plan assets payable to *all participants and beneficiaries*, or . . . to persons tied to particular individual accounts."[32] The latter justification is identical to our test above, and as counsel conceded at argument, the plan's system of tiers included at least one tier, Tier 1, that was not alleged to have been affected by retail-class investments, rendering the former justification inapplicable. As a result, I would affirm the District Court's dismissal of Count V.[33]

If this were the only deficiency in plaintiffs' amended complaint, the appropriate remedy would be to dismiss Count V without prejudice to allow plaintiffs an opportunity to allege sufficient facts regarding the tiers they invested in. However, for the reasons below, I believe that dismissing Count V without prejudice would be futile because plaintiffs have otherwise failed to plead a claim upon which relief can be granted.[34]

IV

---

[32] *Id.* at 256 (emphasis added).

[33] Count III's allegation of excessive overall recordkeeping fees implicates all participants and thus survives this analysis, but it still fails for the reasons stated in Part V below.

[34] "Leave to amend is properly denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a renewed motion to dismiss.'" *City of Cambridge Retirement Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988)).

In *Renfro v. Unisys Corp.*, we evaluated a similar complaint at the same stage in litigation, and determined that the mix and range of investment options in the retirement plan provided by Unisys was sufficient to demonstrate that the defendants' fiduciary duty had been met.[35]  Despite a greater mix and range of options in the instant case, the majority believes that the standards that foreclosed the plaintiffs' arguments in *Renfro* do not do so here.  However, a close look at the facts indicates that plaintiffs' arguments under both Counts III and V are the same as, if not in fact weaker than, in *Renfro*.

I will turn to Count V first.  Three fact patterns were presented in *Renfro*:  the facts surrounding the Unisys plan as well as facts from two cases we considered from other circuits with opposite outcomes.  In *Braden v. Wal-Mart Stores, Inc.*, the Eighth Circuit reversed the district court's grant of a motion to dismiss, as the plan at issue contained only thirteen investment options and was alleged to be part of a kickback scheme.[36]  In contrast, in *Hecker v. Deere & Co.*, the Seventh Circuit affirmed the dismissal of a complaint against a plan with twenty-three mutual fund options and a third-party service that provided beneficiaries access to hundreds more.[37]  The Seventh Circuit reasoned that it was implausible that this structure did not grant beneficiaries sufficient investment

---

[35] 671 F.3d 314, 325–28 (3d Cir. 2011).
[36] 588 F.3d 585, 589–90, 596 (8th Cir. 2009); *see also Renfro*, 671 F.3d at 327.
[37] 556 F.3d 575, 578–79, 586 (7th Cir. 2009); *see also Renfro*, 671 F.3d at 326–27.

choices, as the fees on each of these options ranged from 0.07% to 1% across all funds.[38]

In *Renfro*, the Unisys plan included 73 distinct investment options,[39] 71 of which were specifically named in the operative complaint as having excessive fees. Fees among the investment options in the Unisys plan ranged from 0.1% to 1.21%. We held that since the allegations solely contested the fees charged in the Unisys plan, we could not "infer from what is alleged that the process was flawed,"[40] and we affirmed the dismissal of the excessive investment fees claim.[41]

In the instant case, the Plan has had a minimum of 78 investment options during the class period, 58 of which are specifically contested in the amended complaint. Fees among these options in the Plan range from 0.04% to 0.87%. Despite plaintiffs' claims that these fees are excessive, their attempts to distinguish *Renfro* boil down to the level of detail in the complaint rather than, for example, any change in market circumstances that might render this 0.04% to 0.87% range excessively high today. While the question of fiduciary breach does not boil down to a numerical calculation, plaintiffs do not contest that the Plan has a greater number of investment options than the Unisys plan and that the highest and lowest fees charged by Plan funds are both lower than in *Renfro*. It is therefore difficult to see, in the absence of additional allegations regarding market circumstances or fiduciary misconduct, how this claim could be plausible if the claims in *Renfro* were not.

---

[38] *Hecker*, 556 F.3d at 586.

[39] 671 F.3d at 327.

[40] *Renfro*, 671 F.3d at 327 (quoting *Braden*, 588 F.3d at 596).

[41] *Id.* at 328.

14

The majority believes that endorsing this reasoning would allow a fiduciary to "avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming."[42] This oversimplifies the analysis in *Renfro*, which afforded substantial weight in its discussion of *Braden* to allegations of a kickback scheme.[43] If coupled with other allegations of mismanagement, a plan flooded with hundreds of options might itself be evidence of an imprudently clumsy attempt at fiduciary compliance or a distraction from bad-faith dealings.

In the instant case, plaintiffs do not allege any such schemes. Even their prohibited transaction claims, which the majority properly dismissed, derive from an "extremely broad" reading of 29 U.S.C. § 1106 rather than any self-interest on the part of the fiduciaries. Without more, the Count V challenge to the Plan is neatly circumscribed by *Renfro*, regardless of the level of specificity devoted to the pleadings.[44]

Moreover, plaintiffs' admission that the challenged funds are primarily offered to Tiers 3 and 4 compels this outcome. If the challenged funds were being provided in Tier

---

[42] Maj. Op. at 16.

[43] *See Renfro*, 671 F.3d at 327 ("Unlike the pleadings in *Braden*, plaintiffs have not contended there was any sort of concealed kickback scheme . . . .").

[44] The majority's reliance on *Tibble v. Edison International*, 843 F.3d 1187 (9th Cir. 2016) ("*Tibble IV*"), is misplaced. To the extent that *Tibble IV*, a Ninth Circuit case, contradicts an opinion of the Third Circuit in *Renfro*, it cannot apply in this case.

15

1—that is, to investors who wished to have their investments managed for them—the selection of more expensive share classes in a large portion of the fund would be concerning. However, since Tiers 3 and 4 attract investors who have a more sophisticated understanding of investment options and, inversely, are unlikely to attract investors who might be easily confused by the available investments, the overall mix and range of options is not disturbed by the fact that only the retail-class option was available for a proportion of the funds in these tiers. The majority stresses the importance of "Penn's 'conduct in arriving at an investment decision'"[45] but fails to mention that twenty funds were switched from retail-class shares to institutional-class shares between 2011 and 2016, a shift that demonstrates that defendants, in choosing investment options, were not deliberately ignoring the benefits of institutional-class shares.

The majority alternatively suggests that this analysis is too singularly focused on numerical performance or on allegations of misconduct. But both cannot be true simultaneously. A plausible allegation of either kind at the pleading stage would be sufficient to defeat a motion to dismiss, but plaintiffs here have not plausibly alleged either. I would therefore affirm the District Court's dismissal of Count V.

V

The plain text of *Renfro* also mandates that plaintiffs' Count III claim regarding the method of calculating fees must fail. In rejecting a similar, albeit less thoroughly pled,

---

[45] Maj. Op. at 21 n.7.

16

excessive fees claim, we stated that the *Renfro* plaintiffs' "allegations concerning fees are directed exclusively to the fee structure and are limited to contentions that Unisys should have paid per-participant fees rather than fees based on a percentage of assets in the plan."[46]  This is an exact description of Count III, and the parallel logic is apparent between the two complaints, even if the amended complaint here is supplemented with more concrete numbers than the *Renfro* complaint.  The allegations that failed in *Renfro* must fail here also.

The majority relies solely on *Tussey v. ABB, Inc.*[47] to demonstrate that claims involving excessive recordkeeping fees can survive a motion to dismiss.  This reliance is improper. The Eighth Circuit noted that "unlike" cases like *Renfro*, *Tussey* "involve[d] significant allegations of wrongdoing, including allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense."[48]  Plaintiffs had proven, during a bench trial, that ABB had been explicitly warned about the excessiveness of their revenue sharing agreement and had failed to act in any way upon that warning.[49]

---

[46] 671 F.3d at 327.

[47] 746 F.3d 327 (8th Cir. 2014).

[48] *Tussey*, 746 F.3d at 336.

[49] *Id.* ("The district court found, as a matter of fact, that the ABB fiduciaries [failed to take curative steps] even after ABB's own outside consultant notified ABB the Plan was overpaying for recordkeeping and might be subsidizing ABB's other corporate services.").

17

No such facts are alleged here, and as such, plaintiffs' Count III claim must fail.[50]

## VI

For these reasons, I would affirm the District Court's dismissal of all counts of the amended complaint. I therefore respectfully dissent from the majority's decision to reverse the District Court's dismissal of Counts III and V of the amended complaint.

---

[50] To the extent the majority attempts to rely on DOL Advisory Opinion 2013-03A to support its position that revenue sharing reimbursements might be necessary to satisfy the prudent man standard, this reliance is also misplaced. The quoted language in the advisory opinion merely opines on what a fiduciary must do during revenue sharing negotiations in order to satisfy the prudent man standard. DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4 ("Prudence requires that a plan fiduciary, prior to entering into such an arrangement, will understand the formula, methodology and assumptions used by Principal . . . following disclosure by Principal of all relevant information pertaining to the proposed arrangement.").

18